**PEPSI–COLA COMPANY**

v.

**RHODE ISLAND CARPENTERS DISTRICT COUNCIL.**

**Civ. A. No. 95–595ML.**

United States District Court,
D. Rhode Island.

April 24, 1997.

Walter C. Hunter, Mark A. Pogue, Edwards & Angell, Providence, RI, Duane C. Aldrich, Atlanta, GA, Thomas H. Christopher, Daniel F. Piar, Kilpatrick Stockton, L.L.P., Atlanta, GA, for Plaintiff.

Marc Gursky, Renee Bushey, Providence, RI, for Defendant.

## MEMORANDUM AND DECISION

LISI, District Judge.

This matter arose as a result of picketing conducted by the defendant, the Rhode Island Carpenters District Council, at a facility operated by the plaintiff, the Pepsi–Cola Company. The case was tried to the court sitting without a jury for two days beginning on September 26, 1996. At the court's request, the parties submitted post-trial memoranda in lieu of closing arguments. The matter is now in order for decision.

## I. BACKGROUND

The plaintiff, the Pepsi–Cola Company ("Pepsi"), operates a bottling facility in Cranston, Rhode Island for the production and distribution of soft drinks and other beverage products. The defendant, the Rhode Island Carpenters District Council (the "Council"), is an association of local carpenters organized to promote and represent the interests of its members. No Pepsi employee was represented by the Council at any time concerned here.

In September 1995, Pepsi undertook to make certain improvements on one of its bottling lines. It hired Fluor Daniel, a South Carolina construction company, as the general contractor. Fluor Daniel, in turn, was authorized to hire, and did hire, those subcontractors necessary to complete the work. When agents of local labor organizations learned of the construction project, it was already underway.

On Tuesday, October 3, 1995, William Forward, then the business representative for the Council, and Jack Poland, then the business agent for the local electrical workers' union, went to the Pepsi facility to inquire about job availability for members of their local unions. Initially, they spoke with Leo Collins, the highest ranking Pepsi manager available at the time. Collins referred them to Fluor Daniel. Nevertheless, Forward and Poland requested a meeting with Pepsi management, and one was promptly scheduled and held later that same afternoon.

In attendance at the afternoon meeting were Forward, Poland, and Collins, as well as Jeff Huot, Pepsi's local human resources manager, Louie DiBacco, Pepsi's local maintenance manager, and Dan Cunningham, Fluor Daniel's project manager on site. Forward spoke on behalf of the Council.

Forward explained that he had called the meeting in an effort to secure employment for local carpenters. He stated his belief that Pepsi could arrange to have local union carpenters brought onto the Fluor Daniel project. Pepsi representatives did not respond to this assumption. However, it was made clear at the meeting that all of the subcontracts had been awarded and no additional subcontracts were available. Disappointed with the answer, Forward threatened that he would have no alternative but to set up a picket line unless local union carpenters were employed on that job.

At this point in the meeting, Forward and Poland were each given a letter stating that Pepsi would be instituting a system of separate gates. The letter addressed to Forward read as follows:

> Effective 12:01 am on Wednesday, October 4, 1995, a system of separate gates will be established at the Pepsi–Cola facility at 1400 Pontiac Avenue, Cranston, RI. A Reserved Gate for the exclusive use of employees, agents, and suppliers of Flour [sic] Daniel, Inc. has been established at the southeast corner of the Pepsi facility. Access to that Reserved Gate is on Kenny Drive. Employees and suppliers of Flour [sic] Daniel, Inc. may use only this Reserved Gate and may not use any other entrances to the Pepsi–Cola facility. Therefore, if you choose to engage in any picketing of Flour [sic] Daniel, Inc. at the Pepsi–Cola facility, such picketing must be limited to this Reserved Gate. Failure to limit any such picketing to the Reserved Gate will result in immediate legal action being commenced against the Rhode Island Carpenters District Council to enjoin the action and recover any and all damages.

Shortly after the meeting, Pepsi posted signs outside the five entrances to the Pepsi facility, numbered sequentially one through five. Gates One through Four were designated for the sole use of Pepsi's employees (hereinafter, "Pepsi gates"). A sign was

posted in the southeast corner of the facility outside the Kenny Street entrance, numbered Gate Five (hereinafter, the "contractors' gate"), indicating that that entrance was "for the exclusive use of ... contractors, their employees and suppliers" and advising that "all others [were to] use designated gates." The sign listed 26 companies, including Fluor Daniel.

Following the October 3 meeting, Forward went to the Council's union hall to recruit Council members to picket the Pepsi facility. In preparation, the Council made signs that read "Pepsi Unfair" and "Pepsi Hires Non–Union." Forward testified that, although he knew that some Pepsi employees were members of the International Brotherhood of Teamsters, Local 64 (the "Teamsters") and that the Council and the Teamsters shared the same office building, he did not inform any Teamsters members or officers of his plan to picket Pepsi. Forward did admit, however, that he was aware of the separate gate system instituted by Pepsi and that he understood the concept and practice of setting up separate gates in labor disputes at construction projects.

On Tuesday, October 10, 1995, following the Columbus Day holiday, picket lines formed outside of the Pepsi facility. Starting at about 5:30 a.m., various local trade organizations began picketing the contractors' gate. Many of these pickets wore union apparel which identified them as members of particular local unions. The Council was not among them, however. Rather than picket the contractors' gate, the Council set up pickets along Pontiac Avenue, in front of Gates One and Two, both Pepsi gates. Forward testified that his purpose in setting up pickets in front of the Pepsi gates was "to inform the public about what Pepsi was doing" and "to get jobs for [his] members."

Beginning between approximately 6:00 a.m. and 6:30 a.m., members of the Council, including Forward, marched along the sidewalk and across driveways carrying the signs

they prepared stating "Pepsi Unfair" and "Pepsi Hires Non–Union."[1] Although Forward had instructed his members to "behave themselves," the evidence revealed that several of the Council's members shouted rude epithets and made obscene gestures towards passersby. A video recording captured Forward himself lowering his trousers and bending over so as to be, in his words, "blowing a kiss to the president of Pepsi."

When Pepsi's route drivers, all members the Teamsters union, noticed the picket lines, an informal meeting was called to discuss the situation. Paul Nadeau, their chief union steward, telephoned Paul Sroka, the Teamsters' business agent, who immediately came down to the Cranston facility. After a unanimous vote, Sroka informed Pepsi management that no Teamster would cross a picket line. The Teamsters promptly left the facility. The Teamsters justified this action by relying on certain language in their collective bargaining agreement which they believed permitted them to stop work in the event of labor trouble. Nadeau testified that "as a Teamster, [he] will not cross any picket line," and used the term "Teamster Morality" to describe the refusal by a Teamster to cross any picket line. He further testified that several drivers expressed concern for their safety if they crossed the picket line to run their routes. With the exception of the few drivers who had left on their routes before any picketing began, the Teamsters did not make any deliveries on October 10, 1995.[2]

To the greatest extent possible, Pepsi attempted to make the best of the situation by sending local managers holding commercial drivers licenses on the Teamsters' abandoned routes. However, only about half of Pepsi's routes were serviced that day. Meanwhile, Pepsi sought out additional managers, qualified to operate large commercial vehicles, from nearby Pepsi facilities to drive in the Teamsters' places.

---

1. At various times during the day, a grey car belonging to a Council member was parked across the driveway leading into Gate Two. The evidence was not clear as to whether or not this gate was padlocked during any part of or throughout the day.

2. This work stoppage is presently the subject of a separate grievance between Pepsi and the Teamsters.

As an additional measure, Pepsi contacted Huffmaster Security, a security firm with whom Pepsi had a national contract, to monitor the gate system and to protect against violence to person and property during the picketing. Until Huffmaster arrived, however, Jeff Huot stood watch over the system of separate gates in place to ensure that only Pepsi personnel entered or exited the facility through Pepsi gates.

On that same day, representatives from Fluor Daniel flew from South Carolina to file an unfair labor practices charge against the Council with the National Labor Relations Board in Boston, Massachusetts. This charge, a copy of which was telecopied to Forward that evening, alleged that Forward had unlawfully threatened Pepsi with picketing and that the Council's picketing at the Pepsi facility was illegal. Fluor Daniel also telecopied Forward a letter that evening demanding that the Council's picketing cease.

The following morning, picket lines again formed in the same locations as before: Various local unions picketed the contractors' gate, while the Council picketed the Pepsi gates on Pontiac Avenue. By this time, Huffmaster Security personnel had arrived and were in place. As on October 10, the Teamsters voted not to run their scheduled routes, and local Pepsi managers tried to cover as many routes as was possible. Out-of-state managers from Massachusetts, Connecticut, and as far away as Maine and West Virginia began to arrive later that afternoon. Even with these reenforcements, however, Pepsi was only able to service about sixty to seventy percent of a regular day's accounts.

That afternoon, David Palmisciano, the Council's business agent, arrived at the Pepsi facility with news of a job elsewhere in immediate need of carpentry work. Responding to this call, virtually all of the picketing Council members left the facility in pursuit of this newly discovered work. They did not thereafter return to the Pepsi facility.

The Teamsters, accompanied by the out-of-state managers, ran their usual routes on the morning of Thursday, October 12, 1995. Pepsi, concluding that the strike was over, released and sent the out-of-state managers home on Friday, October 13, 1995. Unsure whether or not the pickets would return, Pepsi decided to keep Huffmaster security in place through the weekend.

On Monday, October 16, 1995, Fluor Daniel withdrew the unfair labor practices charge it had filed against the Council in exchange for assurances that there would be no further picketing.

On November 14, 1995, Pepsi filed the instant complaint charging that the Council engaged in unfair labor practices, as defined by section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), and claimed damages under section 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b). The Council answered and counterclaimed. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 187.

## II. DISCUSSION

### A. *Unfair Trade Practices by a Labor Organization*

Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, creates a right of action in an employer to recover damages caused by reason of a labor organization's unfair labor practices. Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), makes it unfair for a labor organization to engage in certain labor practices when they are calculated toward particular, prohibited ends. This section provides in pertinent part:

(b) It shall be an unfair labor practice for a labor organization or its agents—

\*　　\*　　\*　　\*　　\*　　\*

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce ... to engage in, a strike or a refusal in the course of his employment to ... transport, or otherwise handle ... any goods ... or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*　　\*　　\*　　\*　　\*　　\*

(B) forcing or requiring any person to cease ... transporting, or otherwise dealing in the products of any other producer ... or to cease doing business with any other person ...: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

\* \* \* \* \* \*

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class....

29 U.S.C. § 158.

In this case, Pepsi alleges that the Council picketed Pepsi, induced a walkout, and engaged in threatening and coercive conduct. Pepsi contends that these activities, all in violation of section 8(b)(4)(i, ii), were calculated both to bring pressure to bear on an unrelated third party, in violation of section 8(b)(4)(B), and to unlawfully compel the reassignment of work, in violation of section 8(b)(4)(D). *See* 29 U.S.C. § 158(b)(4).

Following the statutory framework set out above, the court must ascertain two facts. The first involves the *nature* of the union's activity, the second its *purpose. See Brown & Root, Inc. v. Louisiana State AFL–CIO,* 10 F.3d 316, 320 (5th Cir.1994); *Local Union No. 25, A/W Int'l Bhd. of Teamsters v. NLRB,* 831 F.2d 1149, 1152 (1st Cir.1987) *("Boston Deliveries"* ). Although making the requisite determinations may oftentimes be inferential and fact-based, leading to "the drawing of lines more nice than obvious, the statute compels the task." *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB,* 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961) (*"General Electric"*);61125495 *see also NLRB v. International Longshoremen's Ass'n,* 473 U.S. 61, 81, 105 S.Ct. 3045, 3057, 87 L.Ed.2d 47 (1985).

Against this background, the court examines the facts as the statute demands, looking first at the nature of the Council's actions and then to its intended object.

1. *The Nature of the Council's Conduct, 29 U.S.C. § 158(b)(4)(i, ii)*

When Forward first approached Pepsi on October 3, he peacefully inquired into the possibility of bringing local union carpenters onto the Fluor Daniel construction project. His conduct up to and including the October 3 meeting with representatives of Pepsi and Fluor Daniel appears to have been directed toward a legitimate end. However, upon being told that no opportunities were available, his otherwise permissible inquiry transformed into what can only be described as a threat: Either Pepsi see that union carpenters were brought onto the Fluor Daniel job or the Council would picket. Pepsi refused to accede to this demand, and as promised, the Council picketed.

The Council was well aware that a gate had been reserved at the rear of the Pepsi facility for use by Fluor Daniel's employees, contractors, and suppliers. It was also aware of the purpose and utility of such a reserved gate. Nonetheless, the Council established two picket lines in front of the Pepsi facility, both obstructing main entrances, and marched with signs proclaiming that Pepsi engages in employment practices unfair to organized labor. As if this were not enough, the Council's pickets were erected shortly before the first shift change and taken down shortly after the second. Throughout these events, the Council knew that Pepsi had a unionized work force which would use the front gates. The Council now feigns surprise by the Teamsters' walkout and posits no connection between their actions and the Teamsters' refusal to work.

■■■■ It is well settled that a union must take responsibility for the foreseeable consequences of its actions. *See International Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212, 224, 102 S.Ct. 1656, 1663, 72 L.Ed.2d 21 (1982); *NLRB v. Retail Store Employees Union, Local 1001,* 447 U.S. 607, 614 n. 9, 100 S.Ct. 2372, 2378 n. 9, 65 L.Ed.2d 377 (1980); *NLRB v. Local 825, Int'l Union of Operating Eng'rs,* 400 U.S. 297, 304–05, 91 S.Ct. 402, 407–08, 27 L.Ed.2d 398 (1971).

Further, a union is chargeable with the knowledge of the effect that its activities will have on a neutral employer's employees. *See General Electric,* 366 U.S. at 673, 81 S.Ct. at 1289 (" '[I]ntended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers.' ") (quoting *Seafarers Int'l Union v. NLRB,* 265 F.2d 585, 590 (D.C.Cir.1959)); *Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279,* 882 F.2d 1117, 1122 (7th Cir.1989) ("if a neutral employer has a unionized work force, it is likely that its employees will refuse to cross the picket line, even though the pickets are directed at some other employer."). When an employer institutes a system of "reserved" gates, it does so to separate physically the entrance used by a primary employer's employees and suppliers from that used by a neutral employer's employees and suppliers. *See generally Mautz & Oren,* 882 F.2d at 1122–24 (describing purpose and practice of reserved gates in labor disputes). When a labor union proceeds to picket a validly instituted and maintained neutral gate, courts presume an impermissible attempt to interfere with the neutral employer's business. *See, e.g., International Union of Operating Eng'rs, Local 150 v. NLRB,* 47 F.3d 218, 223 (7th Cir.1995); *Carpenters Local 33 v. NLRB,* 873 F.2d 316, 321 (D.C.Cir.1989); *Constar, Inc. v. Plumbers Local 447,* 748 F.2d 520, 522 (9th Cir.1984).

■ The Council's blatant disregard of the reserved gates which were properly instituted and maintained, *see infra* Part II.A.4.iii, considered in conjunction with its signs which misidentified Pepsi as the offending employer, must be seen as a direct appeal to Pepsi's employees to withhold services from Pepsi. *See General Electric,* 366 U.S. at 673, 81 S.Ct. at 1289 ("The objectives of any picketing include a desire to influence others from withholding from the employer their services or trade.") (citing *Sailor's Union of the Pacific (Moore Dry Dock),* 92 NLRB 547 (1950)).[3] Consequently, the court finds that the Council's actions induced the Teamsters' walkout, in violation of section 8(b)(4)(i) of the NLRA. *See* 29 U.S.C. § 158(b)(4)(i).

By no less measure, the court also finds that the Council engaged in threatening and coercive conduct, in violation of section 8(b)(4)(ii). *See* 29 U.S.C. § 158(b)(4)(ii). While these words "are 'nonspecific, indeed vague' and should be interpreted with 'caution' and not given a 'broad sweep,' " *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 578, 108 S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988) (quoting *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639,* 362 U.S. 274, 290, 80 S.Ct. 706, 715, 4 L.Ed.2d 710 (1962)), coercion under section 8(b)(4)(ii) is an elastic concept. *See Pye v. Teamsters Local Union No. 122,* 61 F.3d 1013, 1024 (1st Cir.1995) (wide variety of activity falls within conceptual ambit of section 8(b)(4)(ii)). It must be evaluated pragmatically, "looking to the nature of the coercive conduct, not to the label which it bears." *Id.* (quoting *Boston Deliveries,* 831 F.2d at 1153).

Here, the Council partook in conduct which aimed to obstruct and restrain others from entering the Pepsi facility as well as to coerce Pepsi to give in to the Council's demands. This court heard convincing testimony that Council members shouted foul language, crowded the sidewalk, and made obscene gestures towards passersby. Video footage showed an automobile belonging to a Council officer parked across a driveway, blocking access to and from the Pepsi facility. A photograph vividly illustrated a Council member provocatively gesturing to the photographer by holding his crotch. Although the Council defends these actions as "peaceful," when viewed in context, the Council's conduct must be seen as an attempt to obstruct and deter people from

---

3. In common worksite situations, courts rely on an evidentiary framework first developed by the National Labor Relations Board in *Moore Dry Dock* to resolve whether picketing was aimed at a primary or secondary employer. *See Abreen Corp. v. Laborers' Int'l Union,* 709 F.2d 748, 755 (1st Cir.1983) (acknowledging *Moore Dry Dock* as an evidentiary tool), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984). In this case, however, the circumstances are clear that the Council's picketing was directed at Pepsi. The more difficult issue is whether Pepsi was a secondary employer.

entering Pepsi's facility. Indeed, the very image of Forward bending over with his trousers at his ankles provides ample explanation how the Council sought to deter others from entering Pepsi's establishment. Thus, inasfar as the Council, acting through its participating members, engaged in these practices, the court finds that it violated section 8(b)(4)(ii) in addition to violating section 8(b)(4)(i). *See* 29 U.S.C. § 158(b)(4)(i, ii).

▮ The only question remaining is whether the Council's intent was to bring about an unlawful object. If any part of the intent is prohibited, the activity as a whole is unlawful. *See NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 689, 71 S.Ct. 943, 951, 95 L.Ed. 1284 (1951); *Abreen*, 709 F.2d at 755. Moreover, the same conduct may violate different sections of the NLRA. *See, e.g., NLRB v. Local 825, Int'l Union of Operating Eng'rs*, 400 U.S. 297, 308, 91 S.Ct. 402, 409, 27 L.Ed.2d 398 (1971). With these principles in mind, the court proceeds to consider the propriety of the Council's objectives.

### 2. *Unlawful Secondary Boycott, 29 U.S.C. § 158(b)(4)(B)*

When a labor organization has a dispute with the policies and practices of an employer, it may peacefully picket that employer to affect a change in the policies it finds objectionable. However, when a union pickets a neutral and uninvolved employer to affect those same policies, the union violates section 8(b)(4)(B) by engaging in what is known as an unlawful secondary boycott.

▮ Section 8(b)(4)(B) prohibits a labor organization from utilizing coercive means to force one employer to cease doing business with another. The statute exacts a compromise: It "preserv[es] the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes," on the one hand, while "shielding unoffending employers and others from pressures and controversies not their own," on the other. *Denver Bldg. Council*, 341 U.S. at 692, 71 S.Ct. at 953; *see also Boston Deliveries*, 831 F.2d at 1152. Thus, while a labor union may take action directly against an employer with whom the union has a primary dispute, it

may not embroil an unrelated third party in its controversy with another. *See Abreen*, 709 F.2d at 754–55. As Judge Learned Hand explained almost a half century ago:

> The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop his business with the employer in the hope that this will induce the employer to give into [the union's] demands.

*International Bhd. of Elec. Workers, Local 501 v. NLRB*, 181 F.2d 34, 37 (2d Cir.1950), *aff'd*, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

At the outset, the Council challenges whether Pepsi was, in fact, a neutral party at all. It contends that because Pepsi participated in the selection of the subcontractors, Pepsi was a primary party to this dispute. Buttressing this argument, the Council urges that because Pepsi retained the right to replace a subcontractor under the terms of the Pepsi/Fluor Daniel agreement, Pepsi was a joint, primary employer of the nonunion carpenters rather than a "wholly unconcerned" neutral. *See also infra* Part II.A.4.i.

▮ The neutrality of a party in a labor dispute turns on whether the union's conduct was "addressed to the labor relations of the [third party] vis-a-vis his own employees" or "tactically calculated to satisfy union objectives elsewhere." *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). Thus, a party which is "wholly unconcerned with a disagreement" between two other parties is protected by section 8(b)(4)(B). *John B. Cruz Constr. Co., Inc. v. United Bhd. of Carpenters and Joiners, Local 33*, 907 F.2d 1228, 1231 (1st Cir.1990); *see also Production Workers Union, Local 707 v. NLRB*, 793 F.2d 323, 328 (D.C.Cir.1986). In maintaining that Pepsi was not "wholly unconcerned" with the dispute, the Council ascribes greater meaning to these words than the law necessarily demands.

▮ In determining a party's role in a labor dispute, a court must consider the to-

tality of the circumstances. *See National Woodwork*, 386 U.S. at 644, 87 S.Ct. at 1268. There is no single test or "set of verbal formulae" which informs this decision. *Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 451 (5th Cir.1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971). The question turns on common sense. Keeping with the objectives of the NLRA, the court must determine whether an unrelated party has been embroiled in a labor dispute not his own, *see Production Workers Union, Local 707*, 793 F.2d at 329; or, as the First Circuit has styled the inquiry, whether the pressure is being "applied to force a change in the policies of the directly affected (*i.e.*, 'primary') employer or some other, more remote (*i.e.*, 'secondary') employer?" *Boston Deliveries*, 831 F.2d at 1152. The circumstances here suggest the latter case.

The Council's issue was not with Pepsi policies in relation to its own employees. Virtually all of Pepsi's workforce was unionized.[4] What the Council took issue with were the policies of subcontractors hired by Fluor Daniel on the Pepsi project. The Council's contention that Pepsi is ultimately responsible for the labor policies of these subcontractors is not supported by the record facts.

■■■ The Council maintains that under the terms of the Pepsi/Fluor Daniel agreement, Pepsi could compel the use of only local union carpenters if it so desired. Without the agreement before it, the court cannot fully evaluate the merits of this contention. There was some evidence, however, that Pepsi retained the right to insist on replacement of a subcontractor which violated plant procedures or performed in an unworkmanlike manner. In this court's view, there is a profound difference between retaining the right to demand the replacement of shoddy or unsafe workers and exercising complete, unfettered control over every employment decision that an independent contractor might make. Doubtless, a decision whether

to hire union or nonunion labor must be included within this latter category. However, even assuming that Pepsi had greater control than the court can divine from the sparse evidence presented on this point, the right to control an employer is but one factor a court may consider in determining the neutrality of a party in a labor dispute. *See NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters, Local Union No. 638*, 429 U.S. 507, 524, 97 S.Ct. 891, 901, 51 L.Ed.2d 1 (1977). The neutrality question must still be guided by all the surrounding circumstances. *See Boston Deliveries*, 831 F.2d at 1153.

In this case, Pepsi might have, but did not, exercise any meaningful control over the carpentry subcontractors. Pepsi supplied Fluor Daniel with the specifications for the improvements to be performed on the bottling line. Fluor Daniel, in turn, solicited bids from the subcontractors. Fluor Daniel was responsible for selecting and overseeing the subcontractors, and Fluor Daniel paid them. It seems apparent to this court that Pepsi had little or no involvement with the subcontractors other than making sure that the bottling line was shut down when work was to be performed. The remainder of the subcontractors' duties were Fluor Daniel's responsibility. The Council nevertheless clings jealously to its position that Pepsi had at least some concern in the carpentry subcontracts.

In every construction project, the owner has *some* concern in the work being performed. While a general contractor may be non-neutral in relation to the subcontractors which it hires, *see Barss v. Tosches*, 785 F.2d 20, 22 (1st Cir.1986), the relationship between the owner and its general contractor's subcontractors is more remote. When a union seeks to bypass the general contractor's role in this tripartite relationship, it triggers the protections of section 8(b)(4)(B). The broader objectives of the statute demand that an owner situated as Pepsi be shielded

---

4. Pepsi employs over 200 workers at the Cranston facility. Of these, about 100 are interior workers, about 64 are route drivers, and about 25 are either management or administrative workers. With the exception of the management and administrative employees, all of Pepsi's workforce is unionized.

from becoming "a union pawn in an end game directed at some other employer." *Boston Deliveries,* 831 F.2d at 1152. Thus, insofar as Pepsi's role in this dispute was concerned, the court concludes that Pepsi was a neutral, secondary party.[5]

Finding that Pepsi was a protected neutral, the court proceeds to consider whether the Council intended to pressure Pepsi to cease doing business with another employer, in this case, either Fluor Daniel or its carpentry subcontractors. There was an abundance of evidence which indicates that it did. Forward himself testified that his purpose in approaching Pepsi was to get jobs for his union's members. The court finds no credence to his later qualifying this admission by saying that the picketing was intended to educate the public about what Pepsi was doing.[6]

The Council's actions speak louder than words. Even though it was informed well in advance that separate gates would be instituted, it failed to observe them in effect. Further, it prepared and picketed with signs which deliberately misidentified Pepsi as an offending employer, brazenly calling Pepsi unfair to organized labor for hiring nonunion. No signs made reference to either Fluor Daniel or any of the individual subcontractors.

Finally, this court cannot discern any educational value in the Council members' rude gesticulations, foul language, and generally sophomoric antics on the picket line. To the contrary, these actions were undertaken to induce Pepsi's employees to strike until Pepsi would capitulate to the Council's demands. The Council wanted jobs, and its members picketed to get them. Either Pepsi would fire the nonunion subcontractors, or it would fire Fluor Daniel, or it would force Fluor Daniel to fire the nonunion subcontractors. One way or the other, the Council's scheme was to cause Pepsi to cease doing business with someone. Such a goal exemplifies an unlawful secondary boycott.

### 3. *Jurisdictional Strike, 29 U.S.C. § 158(b)(4)(D)*

Similar to Pepsi's charge of an unlawful secondary boycott is its claim of an unlawful jurisdictional strike, in violation of section 8(b)(4)(D). *See* 29 U.S.C. § 158(b)(4)(D). Section 8(b)(4)(D) makes it an unfair labor practice for a labor union to utilize proscribed means to force an employer to assign particular work to one group of employees rather than another. *See NLRB v. Radio & Television Broad. Eng'rs Union, Local 1212,* 364 U.S. 573, 579, 81 S.Ct. 330, 334, 5 L.Ed.2d 302 (1961) *("CBS ").* The same facts recharacterized, Pepsi complains that Council members engaged in a strike to compel the reassignment of the carpentry subcontracts from the out-of-state, nonunion contractors to themselves. While section 8(b)(4)(D) is more frequently seen in the context of section 10(k) proceedings, *see* 29 U.S.C. § 160(k), violation of its provisions also states a claim for damages under section 303.[7]

---

**5.** The Council's fall-back position is that its picketing was in response to an objectionable bidding process in which Pepsi participated. Even if there is credence to this possibility, the viability of this argument depends on the object of the union's picketing. *See Barss v. Tosches,* 785 F.2d at 22; *Abreen,* 709 F.2d at 754. Here, the Council did not picket to encourage Pepsi's greater oversight over the process by which bids would be solicited in the future. If it did, it made no effort to clarify this purpose. *See Abreen,* 709 F.2d at 755 (unions obligated to uninvolved employers to "picket with restraint"). Rather, the Council's purpose throughout these events was to get jobs for its members by having the nonunion carpenters fired and replaced with Council members.

**6.** Of course, when an employment opportunity presented itself elsewhere, Forward lamented "los[ing]" all his pickets." This evidence suggests that the Council's true intent was securing employment and that public education played an insignificant part.

**7.** Congress created two independent remedies under the NLRA. Under section 10(k), the NLRB may resolve the underlying dispute in a special expedited proceeding. *See* 29 U.S.C. § 160(k). At the same time, however, an injured employer may also seek damages under section 303(b) for injuries resulting from an unlawful jurisdictional strike. *See* 29 U.S.C. § 187(b); *Abreen,* 709 F.2d at 754 n. 3. It is not necessary that there be any prior administrative determination that the defendant labor organization violated section 8(b)(4)(D). *See International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp.,* 342 U.S. 237, 244, 72 S.Ct. 235, 239, 96 L.Ed. 275 (1952); *ACMAT Corp. v. International Union of Operating Eng'rs, Local 478,* 442 F.Supp. 772, 780 (D.Conn.1977).

A jurisdictional dispute is a conflict between rival groups of employees over which should be assigned certain work. *International Longshoremen's & Warehousemen's Union, Local 62–B v. NLRB*, 781 F.2d 919, 923 (D.C.Cir.1986) ("*Alaska Timber*"). The employer ordinarily is caught between the two with no particular interest in the outcome. *See id.* at 924 (quoting *CBS*, 364 U.S. at 579, 81 S.Ct. at 334 ("[I]n most instances, [the quarrel] is of so little interest to the employer that he seems perfectly willing to assign work to either [group of employees] if the other will just let him alone.")); *see also International Longshoremen's & Warehousemen's Union, Local 14 v. NLRB*, 85 F.3d 646, 652 (D.C.Cir.1996) ("*Sierra Pacific*"). Therefore, unlike section 8(b)(4)(B), an employer's neutrality is not a prerequisite to its protection under section 8(b)(4)(D). *See NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 130, 92 S.Ct. 360, 369, 30 L.Ed.2d 312 (1971) (section 8(b)(4)(D) enacted to protect both partisan and neutral employers); *International Longshoremen's and Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1412 n. 7 (D.C.Cir.1989) ("that an employer may prefer one group of employees over another . . . does not render the dispute non-jurisdictional."). Instead, the focus of a section 8(b)(4)(D) claim is upon the opposing groups and the means selected to resolve their adversity.

■ The first step in the section 8(b)(4)(D) analysis is to establish the existence of a jurisdictional dispute. *Alaska Timber*, 781 F.2d at 924. This requires that there be at least two groups, each with an interest in performing the same work.[8] While the typical case involves two unions, section 8(b)(4)(D) is also violated where a union seeks the reassignment of work from nonunion workers to itself, *see CBS*, 364 U.S. at 584, 81 S.Ct. at 337; *Sierra Pacific*, 85 F.3d at 652, or from nonlocal workers to itself, *see International Bhd. of Elec. Workers, Local 639 (Bendix Radio Div.)*, 138 NLRB 689, 696 (1962). It is of no consequence that one group never made an explicit claim to the work. The fact that a group is actually doing the work evidences that group's claim to it. *Alaska Timber*, 781 F.2d at 924; *International Longshoremen's and Warehousemen's Union, Local 29 (Van Camp Seafood Co.)*, 225 NLRB 624, 626, 1976 WL 7272 (1976).

■ The second step is to make sure that the dispute is not one of the employer's own making. *Alaska Timber*, 781 F.2d at 924. For example, where an employer lays workers off or transfers work from one group to another for its own reasons, it garners no protection from section 8(b)(4)(D). *See id.* at 925. This rule ensures that an employer is unable to "manufacture" a jurisdictional dispute under section 8(b)(4)(D) every time it reassigns work from one group to another. *See id.* In this case, Pepsi refused to give in to the Council's demands and did not reassign any work. Thus, this second concern is not implicated. Rather, this case fits neatly into the labor jurisdictional paradigm. *Cf. Operating Eng'rs*, 400 U.S. at 302, 91 S.Ct. at 405–06.

■ As has already been exhaustively discussed, the court views the Council's picketing and related activities as directed toward creating opportunities for local, union carpenters. Of course, union jobs could not be created without first being taken away from the out-of-state, nonunion carpenters. There was only so much work to be done. Therefore, this court has no difficulty in concluding that an object of the Council's picketing was to force the replacement of the nonunion subcontractors with the Council's members: there was particular, identified work which one group was performing, and the Council utilized proscribed means to take

---

**8.** There must be an genuine dispute between two employee groups. For example, where one of two potentially competing unions explicitly disclaims or renounces a prior claim to disputed work, no jurisdictional dispute exists. *See, e.g., International Union of Operating Eng'rs, Local 925 (Bradshaw Industrial Coatings, Inc.)*, 264 NLRB 962, 964, 1982 WL 23764 (1982); *Local 372, Service Employees Int'l Union (Pepper Constr. Co.)*, 262 NLRB 815, 816, 1982 WL 24663 (1982). Similarly, if competing claims between employee groups are resolved, no jurisdictional dispute remains, even if the employer protests the particular resolution. *See Teamsters, Warehousemen, Garage Employees & Helpers Union Local 839 (Shurtleff & Andrews Constructors)*, 249 NLRB 176, 177, 1980 WL 11374 (1980), *review denied*, 695 F.2d 424 (9th Cir.1982).

these jobs away to have them for itself. Significantly, the Council does not advance any argument to rebut this charge.

### 4. *The Council's Defenses*

In response to overwhelming evidence of impropriety, the Council "throws the book" at Pepsi's complaint. Among the several affirmative defenses raised are that Pepsi and Fluor Daniel were "allies," that the Council was engaged in lawful area standards picketing, that the system of neutral gates was improperly established and maintained, that the picketing was protected either by the publicity proviso of section 8(b)(4) or the First Amendment of the United States Constitution, and, finally, that Pepsi failed to exhaust its contractual remedies under its collective bargaining agreement with the Teamsters. All of these are without merit. The court takes up each briefly in turn.

#### i. *The Ally Doctrine*

 The Council's first line of attack is that Pepsi and Fluor Daniel were "allies" and that, as such, the two should be treated as a single employer.[9] Indeed, where two entities share common ownership and management, interrelatedness of operations, and share central control over labor relations, they may be considered as a single employer. *See Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 25 (1st Cir.) (citing *Radio & Television Broad. Technicians, Local Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam)), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 353 (1st Cir.1990) (distinguishing "single employer" from "alter egos" status). In this event, a labor union may picket the combined entity because neither employer is neutral in relation to the dispute. *See John B. Cruz Constr. Co.*, 907 F.2d at 1231.

9. Pepsi points out that even if Pepsi and Fluor Daniel were construed to be a single entity, the Council's picketing would have still been unlawful, as its dispute was really with the employment practices of the individual nonunion subcontractors. If its purpose was to bring pressure to bear

In this case, however, there was no credible evidence that Pepsi and Fluor Daniel were allies. They did not share a community of management and control or interrelatedness of operations. The Council points to the fact that Pepsi made some office space at the Cranston facility available for Fluor Daniel's use. This spacial accommodation alone does not integrate the management and control of two multimillion dollar corporations.

Likewise, the Council makes much of an innocent remark by Jeff Huot in which he referred to Pepsi and Fluor Daniel collectively as "we." This remark arose in the context of joint efforts being made to enjoin what both companies believed to be unlawful picketing. While Pepsi and Fluor Daniel may have shared a mutual interest in avoiding labor trouble at the Cranston facility, such commonality does not make them "allies." Pepsi's and Fluor Daniel's relationship was much more straightforward than the Council would have one believe: Fluor Daniel was merely a contractor on a project at a Pepsi facility. While this relationship requires a certain level of cooperation between the two, mere cooperation does not signify the kind of joint undertaking with which the ally doctrine is concerned.

#### ii. *Area Standards Picketing*

 Next, the Council argues that it was engaged in lawful area standards picketing. "Area standards picketing is picketing by a union to protest the fact that an employer is nonunion and is paying below the wage rates established in the area by union pressure." *Abreen*, 709 F.2d at 755 n. 4 (citing *NLRB v. International Bhd. of Elec. Workers, Local 265*, 604 F.2d 1091, 1097 (8th Cir.1979)). If properly conducted, area standards picketing is lawful. *See id.* For the area standards rule to apply, however, the union must have area standards as its *sole* object. *See IBEW, Local 265*, 604 F.2d at 1097; *cf. Barss v. Tosches*, 785 F.2d at 22 n.

on Fluor Daniel to affect the policies of the subcontractors then, Pepsi asserts, this object too would violate section 8(b)(4)(B). *But cf. Barss v. Tosches*, 785 F.2d at 22. The court expresses no opinion on this point.

2. Even if the Council had maintaining area standards among its goals, as this court has already concluded, its central objective was to secure employment opportunities for its members. Accordingly, the area standards exception is inapplicable in this case.

### iii. Breakdown of Reserved Gates

The Council also contends that Pepsi's system of separate gates was improperly established and maintained in more than one respect. First, it points to the fact that there was no gate specifically designated for the use of Pepsi's guests, vendors, and suppliers. While the system of reserved gates is only a piece of this puzzle, see Abreen, 709 F.2d at 756 (object of union picketing determined by totality of circumstances), this fact does not impact on the reserved gate analysis. Regardless of which gate a Pepsi guest might have entered, no taint would have occurred. The purpose of reserved gates is to ensure that persons associated with the primary employer are unable to circumvent a picket line. See Mautz & Oren, 882 F.2d at 1122. If persons associated with a secondary employer enter through a primary employer's gate, the picketing union suffers no harm because its audience is broadened rather than narrowed. See id. n. 4.

■ A related argument speaks of a single incident of breach in the reserved gates. The facts relevant to this event are these. On the first day of picketing, a single Fluor Daniel worker parked his car in Pepsi's main parking lot and entered the Pepsi Facility through Gate Two, a Pepsi gate. Jeff Huot, who was monitoring the Pepsi gates until Huffmaster security personnel were in place, noticed the worker about thirty feet into the facility, stopped him, and instructed him to leave the way he came in. The individual left as directed and reentered the facility through the contractors' gate. This was the only apparent incident of breach.[10]

■ "Gate pollution," as it is called, occurs when there is some "pattern of destruction of the reserved gate system;" it does not occur with an isolated or de minimis incident of breach. See Mautz & Oren, 882 F.2d at 1123 (citing cases); but see International Bhd. of Elec. Workers, Local 211, 277 NLRB 1041, 1043–44, 1985 WL 46134 (1985) (finding reserved gate break-down from single, aborted attempt to deliver standby generator to primary employer through neutral gate). The court cannot say that the precautions taken by Pepsi to protect the reserved gates while awaiting the arrival of Huffmaster personnel were unreasonable. Through diligent efforts, Jeff Huot averted the only incident of breach alleged. Later, with Huffmaster security in place, more stringent measures were employed to enforce the reserved gate system. See Mautz & Oren, 882 F.2d at 1123 (employer may "rehabilitate" polluted gates by renewing efforts to maintain reserved gates). It is the finding of this court that the reserved gates were properly established and maintained.

### iv. Informational Picketing

■ Next, the Council asserts that its conduct was purposed towards "truthfully advising the public," both as an exercise of free speech under the First Amendment and the publicity proviso of section 8(b)(4).[11] Despite the Council's naked assertions on this point, the court finds that the Council members' use of obscene language and lewd behavior, including Forward's juvenile gesture directed toward Pepsi's president, were never intended to better educate the public.

---

**10.** Paul Nadeau testified that he observed several non-Pepsi personnel utilize Pepsi gates. The court, however, did not find this testimony to be credible and affords no weight to it.

**11.** The 1959 amendments to the NLRA added the following provision to the end of section 8(b)(4):

Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public·... that ... prod-ucts are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution[.]

29 U.S.C. § 158(b)(4) (some emphasis added).

These activities, undertaken in conjunction with picketing across driveways, were more "obstructive" than "expressive." *See Pye*, 61 F.3d at 1023 n. 10. In light of the vivid evidence seen and heard at trial, the court does not believe the Council's picketing was purely for informational purposes. "Picketing is a mixture of conduct and communication," *Edward J. DeBartolo Corp.*, 485 U.S. at 580, 108 S.Ct. at 1400 (internal quotation omitted), and picketing which has as an object causing injury to an unrelated party is not protected by the First Amendment. *See International Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. at 226, 102 S.Ct. at 1664; *Retail Store Employees*, 447 U.S. at 616 & 618–19, 100 S.Ct. at 2378 & 2379–80; *cf. NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 62–63, 84 S.Ct. 1063, 1065–66, 12 L.Ed.2d 129 (1964).

The publicity proviso in the statute provides no better justification. While section 8(b)(4) shelters some activity directed at "truthfully advising the public," the statute explicitly excludes picketing as a permissible means. 29 U.S.C. § 158(b)(4); *see also Edward J. DeBartolo Corp.*, 485 U.S. at 581–82, 108 S.Ct. at 1400–02. Furthermore, nonpicketing publicity is not protected by the statute when it has the effect of inducing employees of secondary employers to refuse to transport goods from their employer's place of business. *See id.* The Council purposefully targeted Pepsi, a neutral employer, and picketed. This conduct induced Pepsi's employees, the Teamsters, not to transport Pepsi's beverage products from its facility. Such conduct falls squarely outside the statutory protection afforded by the proviso and provides no defense to the Council.

### v. *Failure to Exhaust Contractual Remedies*

■ Finally, the Council apparently claims that Pepsi did not suffer a legally cognizable injury because it did not fully exhaust the contractual remedies available under its collective bargaining agreement

with the Teamsters. There was simply no evidence, however, that Pepsi owed the Council a statutory or contractual duty to pursue extrajudicial remedies before seeking relief directly under the LMRA. Absent evidence that Pepsi agreed to so condition this right, there is no basis imposing any such requirement. *See Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376, 104 S.Ct. 1844, 1851, 80 L.Ed.2d 366 (1984). Accordingly, the Council lacks standing to raise Pepsi's agreement with the Teamsters as a shield to liability for its own actions.

### B. *Damages*

■ Having found that the Council committed numerous unfair labor practices in violation of section 8(b)(4), the court turns its attention to damages. Section 303(b) of the LMRA provides that a party may recover those damages sustained "by reason of" any violation of section 8(b)(4) of the NLRA. 29 U.S.C. § 187; *see also Local 20, Teamsters, Chauffeurs, and Helpers Union v. Morton*, 377 U.S. 252, 261–62, 84 S.Ct. 1253, 1259–60, 12 L.Ed.2d 280 (1964); *Abreen*, 709 F.2d at 759. An award may include those actual and compensatory damages which followed from the direct and proximate result of unfair labor practices by a labor organization. *See John B. Cruz Constr. Co.*, 907 F.2d at 1232. While damages may not be speculative, they need not be proven with precision. *See Abreen*, 709 F.2d at 761. An injured party need only establish with " 'reasonable probability the existence of some causal connection between the defendant's wrongful act and some [anticipated loss].' " *John B. Cruz Constr. Co.*, 907 F.2d at 1232 (quoting *Mead v. Retail Clerks Int'l Ass'n*, 523 F.2d 1371, 1377 (9th Cir.1975)).

The damages Pepsi claims in this case fall into two broad categories. First are those out-of-pocket expenses relating to the out-of-state managers, including those for the managers' transportation, food, and lodging. Second are the payments made to Huffmaster Security, including transportation, food, and lodging expenses for its personnel.[12]

12. Initially, Pepsi also claimed damages for lost sales. However, insufficient evidence was presented at trial on this issue.

The court examines all of these expenses more closely below.

### 1. Expenses Relating to the Out-of-State Managers

■ In response to the Teamsters' walk-out, Pepsi arranged alternate means of servicing its customers. This effort involved sending managers on the Teamsters' routes. Of course, the few local managers immediately available could not possibly have done all the work of all the Teamsters. Thus, to minimize the damages which Pepsi would incur in the form of lost sales and goodwill, Pepsi transported additional managers from outlying Pepsi facilities to assist in making deliveries for as long as necessary. Needless to say, at the time Pepsi made arrangements for the out-of-state managers, it had no way of knowing that the Council's picketing would only continue for two days.

Some managers were available at nearby Pepsi facilities in Massachusetts and Connecticut. However, others had to be flown from more distant locations in Maine and West Virginia at Pepsi's expense. Pepsi paid for two nights lodging at a local budget hotel in Warwick, Rhode Island. Pepsi also paid for some of the managers' meals as well as provided ground transportation for them by renting three mini-vans. Additionally, Pepsi purchased local street maps for the managers' expected use in running the Teamsters' sales routes. Finally, Pepsi paid additional compensation to the out-of-state managers for their extraordinary service in the form of twenty-seven $50.00 gift cheques. The court cannot say that any of these expenditures were either unreasonable or unnecessary.

■ Courts have generally awarded injured employers those out-of-pocket expenses associated with maintaining a standby posture until full operations can resume. *See Frito–Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters,* 623 F.2d 1354, 1364 (9th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *see also Matson Plastering Co., Inc. v. Plasterers and Shophands Local No. 66,* 852 F.2d 1200, 1202 (9th Cir.), *cert. denied,* 488 U.S. 994, 109 S.Ct. 561, 102 L.Ed.2d 586 (1988). While an employer must minimize the damages which would be caused by a union's unlawful actions, *see Allied Int'l, Inc. v. International Longshoremen's Ass'n,* 814 F.2d 32, 38 (1st Cir.), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987), this court does not find that any of Pepsi's claimed expenses were excessive in light of the exigent circumstances with which it found itself confronted. The expenses associated with the out-of-state managers, totaling $16,515.08, are therefore allowed.[13]

### 2. Private Security

■ The costs associated with Huffmaster Security present a closer call. The Council questions whether these expenses were causally related to its unlawful conduct and, if so, it asks that the damages be apportioned to include only those costs attributable to its unlawful activities. It disclaims responsibility for those security costs resulting from other unions' picketing at the rear of the facility.

■ It is well settled that a union is liable for those damages to which its unlawful activity "materially contributed" or played "a substantial factor in bringing ... about." *Mead v. Retail Clerks,* 523 F.2d at 1379. Courts generally include private security costs within the scope of allowable damages in a section 303 suit. *See, e.g., Metropolitan Paving Co. v. International Union of Operating Eng'rs,* 439 F.2d 300, 305 (10th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58 (1971); *Flame Coal Co. v. United Mine Workers,* 303 F.2d 39, 46 (6th Cir.), *cert. denied,* 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); *Cranshaw Constr. of New England v. International Ass'n of Bridge, Structural, & Ornamental Ironworkers, Local No. 7,* 891 F.Supp. 666, 678 (D.Mass.1995). Here, the need for Huffmas-

---

13. The expenses in connection with the out-of-state managers are itemized as follows:

| | |
|---|---|
| Airfare | $11,275.00 |
| Lodging | 2,649.47 |
| Meals | 677.34 |
| Ground Transportation | 399.33 |
| Maps | 163.94 |
| Gift Cheques | 1,350.00 |
| TOTAL | $16,515.08 |

ter security can be traced back to the Council's October 3 threat of establishing picket lines and is supported by "a just and reasonable inference" that Pepsi hired Huffmaster to protect against violence to person and property in response to this threat. *John B. Cruz Constr. Co.*, 907 F.2d at 1232; *see also Mead*, 523 F.2d at 1379. The fact that the Council's members themselves did not engage in violent behavior is irrelevant. Indeed, the presence of the Huffmaster security guards may well have averted potential violence. Moreover, it does not strike the court as unreasonable to keep the security teams in place through the weekend, until assurances were given that there would be no further picketing.

More troublesome, however, is the question of apportioning particular security expenses to the Council's unlawful activities. The union believes it should not have to bear the costs of the security teams in the rear of the facility because it picketed only in the front. No evidence was presented attributing particular security costs to discrete locations.

■ Generally, a labor organization is responsible only for the consequences of its unlawful actions. Where a union's combined lawful and unlawful conduct causes injury to another, it bears the consequences only for its unlawful conduct provided that the effects of those activities are separable. *See Mead*, 523 F.2d at 1378 (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 731–32 & n. 17, 86 S.Ct. 1130, 1141–42 & n. 17, 16 L.Ed.2d 218 (1966) and *Local 20, Teamsters v. Morton*, 377 U.S. at 261–62, 84 S.Ct. at 1259–60). However, where a union's own conduct makes it impossible to apportion damages between lawful and unlawful conduct, the union bears the consequences for both. *See Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers Local 494*, 798 F.2d 1016, 1022 (7th Cir.1986). "The fact that certain losses may not have resulted directly from specific acts which evidence the union['s] unlawful intentions is irrelevant so long as the losses are traceable to actions

forming part of the overall secondary activity." *Abreen*, 709 F.2d at 759.

Although the facts in this case are not identical to those in *Abreen* and *Boxhorn's*, the principle derived from these cases applies here. The Council first unlawfully threatened Pepsi and then unlawfully picketed. In so doing, it opened itself to suit for all the damages proximately caused thereby. The need for private security is directly traceable to the Council's unlawful threat, and it cannot be gainsaid that its unlawful picketing did not materially contribute to Pepsi's loss. Thus, the court allows all of the Huffmaster charges to be recovered up through October 15, 1995, including lodging and transportation for Huffmaster personnel. The court finds that these costs total $22,691.69.[14]

### C. The Council's Counterclaim

Finally, the Council asserts a counterclaim contending that Rhode Island General Laws § 9–33–1 to 9–33–4 entitles them to damages, costs, and attorney fees incurred for having to defend against this, so-called, "SLAPP" (Strategic Litigation Against Public Policy) lawsuit. In response, Pepsi filed a motion to dismiss this counterclaim pursuant to Fed. R.Civ.P. 12(b)(6) arguing that federal labor law preempts this state law claim. The motion was referred to Magistrate Judge Timothy M. Boudewyns, who, on September 19, 1996, issued a report recommending that Pepsi's motion be granted. Due to the proximity of trial, however, the court permitted the defendant to file an objection to the report and recommendation with its post-trial memorandum.

This court reviews the magistrate judge's conclusions of law *de novo*. Fed.R.Civ.P. 72(b); *Barry v. Mortgage Servicing Acquisition Corp.*, 941 F.Supp. 278, 281 (D.R.I.1996). While the court discerns no error in the magistrate judge's analysis, it reaches the same conclusion a slightly different way.

■ The NLRA precludes an award of damages under state law "[w]hen it is clear or may fairly be assumed that the activities

---

**14.** The court is excluding $4,995.00 for video services billed by Huffmaster which were never produced either during discovery or at trial.

which a State purports to regulate are protected by section 7 of the National Labor Relations Act, or constitute an unfair labor practice under section 8...." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *see also Local 20, Teamsters v. Morton,* 377 U.S. at 259–61, 84 S.Ct. at 1258–59. In other words, the NLRA preempts state law where the conduct called into question is arguably regulated by sections 7 or 8 of the NLRA. *See Cranshaw Constr.,* 891 F.Supp. at 674. In this case, the Council claims an injury on account of having to defend a lawsuit brought, allegedly, in retaliation for the Council members' exercise of their protected rights.

In *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the Supreme Court held that an employer's filing a baseless lawsuit against an employee in retaliation for that employee's exercise of his protected rights was an unfair labor practice under section 7 of the NLRA. *See id.* at 744, 103 S.Ct. at 2170. Thus, even if this court were to indulge the Council's baseless argument on this point, federal labor law provides the remedy. *See id.; Local 30, United Slate, Tile, & Composition Roofers,* 1 F.3d 1419, 1426 (3d Cir. 1993); *Boston Deliveries,* 831 F.2d at 1154. This being the case, whatever the Council's claimed rights might be under the Rhode Island statute, they are preempted by federal law, and, accordingly, defendant's counterclaim is dismissed.

## III. CONCLUSION

For the reasons detailed above, the court enters judgment in favor of the plaintiff in the amount of $39,206.77.

IT IS SO ORDERED.