**INTERCITY MAINTENANCE CO., Plaintiff,**

v.

**LOCAL 254 SERVICE EMPLOYEES INTERNATIONAL UNION, Service Employees International Union, AFL–CIO, Victor Lima, and Donald Coleman, Defendants.**

No. 95–630.

United States District Court, D. Rhode Island.

July 29, 1999.

Vincent F. Ragosta, Jr., Matthew Oliverio, Providence, RI, Christine M. Curley, N. Kingstown, RI, for plaintiff.

Daniel V. McKinnon, McKinnon & Harwood, Pawtucket, RI, Richard M. Peirce, Roberts, Carroll, Feldstein & Peirce, Inc., Providence, RI, Eunice Harris Washington, Service Employees Int'l Union, AFL–CIO, CLC, Washington, DC, Steven K. Hoffman, James & Hoffman, Washington, DC, for defendants.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

This litigation embodies the classic struggle between employer and union. In this labor dispute, like in many others that escalate to such a dramatic level of contention, the former is committed to operating on a non-union basis while the latter is equally devoted to challenging that employer's labor policy. Economic philosophies clashed. An often personal battle of wills ensued, replete with threats, posturing, and collateral damage. Plaintiff Intercity Maintenance Co. ("Intercity") alleges that the union defendants crossed the bounds of acceptable behavior established by the labor laws that govern organizing campaigns. Most importantly, Intercity avers damage to its business from improper secondary boycotting orchestrated by defendants. Plaintiff also presses a variety of state tort claims, including tortious interference with its busi-

ness relationships, defamation, and violation of its privacy rights. Plaintiff seeks to hold liable union actors all along the chain of command, from the Service Employees International Union, AFL–CIO ("International" or "SEIU") and Local 254 Service Employees International Union ("Local 254") to individual union officials Victor Lima ("Lima") and Donald Coleman ("Coleman"). Defendants counter with a raft of defenses and move for summary judgment on all counts of the Amended Complaint. For the reasons stated below, defendants' Motions for Summary Judgment are granted in part and denied in part.

## BACKGROUND

On a motion for summary judgment, the Court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 106 (1st Cir.1997). The following factual recital is constructed with that instruction in mind.

Intercity, a small corporation based in Cumberland, Rhode Island, provides janitorial services to commercial buildings in the Providence, Rhode Island area. Michael Bouthillette ("Bouthillette"), president of Intercity, hoped to establish the company as an important provider of janitorial services to the health care sector in Providence. To this end, Intercity secured work at the Providence facilities of Women & Infants Hospital ("Women & Infants") and Blue Cross/Blue Shield of Rhode Island ("Blue Cross"). As of late 1994, none of Intercity's employees were unionized. Local 254 wished to change that.

In December 1994, Lima, an employee of Local 254 assigned to the task of organizing janitorial workers in Providence, telephoned Bouthillette to announce that Local 254 planned to organize Intercity's employees working at the Blue Cross site. Lima requested that Intercity voluntarily recognize Local 254 as the workers' collective bargaining agent. Bouthillette re-fused the offer and explained that the decision would have to be made by the workers themselves. The two parties jousted over the telephone without resolution for some time. Lima approached Intercity employees at their Blue Cross job site and encouraged them to sign union affiliation cards. Some apparently did so. Bouthillette, learning of this intrusion into the employees' work day, ordered Lima to leave Intercity's employees alone when they were working. In January 1995, Lima and Bouthillette agreed to meet face to face.

At the meeting between Bouthillette and Lima, also attended by Robert Richard, Bouthillette's friend, Lima presented Bouthillette with signed affiliation cards from Intercity employees working at the Blue Cross site. Lima insisted that Local 254 was only interested in representing Intercity's employees working at that facility, and not those working at other buildings in the area. According to Bouthillette, Lima insisted that if Intercity did not comply with Local 254's request for voluntary recognition, the union would cause the company to lose the Blue Cross job, harass people associated with Intercity, and eventually drive Intercity out of business. Bouthillette recalls that Lima boasted that the union would use "Latino terrorist organizations," ex-convicts, and homeless people to accomplish its goals. To lend credence to these threats, Bouthillette maintains, Lima explained that Local 254 had severely damaged the business of another local janitorial services company, Aid Maintenance, for resisting the union's efforts to organize. Nonetheless, Bouthillettte remained steadfast in his refusal to knuckle under.

Undeterred, the persistent Lima and Local 254 pressed on with their organizing campaign. Attempts by Lima to speak to Intercity employees at the Blue Cross site were rebuffed by Intercity and Blue Cross security. Local 254 also renewed its efforts to convince Bouthillette to voluntarily recognize the union. Coleman, the di-

rector of organizing for the local, and Lima, Coleman's assistant, spoke to the company president on several occasions in January and February 1995. Unknown to the union representatives, Bouthillette recorded many of those conversations. Bouthillette now presents the transcripts of those audio recordings as evidence.

During these telephone discussions, Lima and Coleman first tried to cajole Bouthillette into coming around to their position. As Bouthillette stood firm, the two union officials eventually turned up the heat. During one conversation, Lima responded to Bouthillette's continued defiance with the following threat: "Well, then we're going to fight you all the way on this. We're going to call Blue Cross/Blue Shield and put a picket line up." Later in that same conversation, Lima offered the following: "Well, I'm just going to tell you what's going to happen now. I don't know how long you'll probably stay at Blue Cross, but I'm going to call them up right after I talk to you." Lima soon thereafter made his intentions express: "I guarantee you, Blue Cross ain't going to tolerate a picket line up there because we've picketed them in Boston before and all the other unions. We're going to put a nationwide boycott there, you think they're going to like that?" Bouthillette inferred a threat of violence from Lima's warning that he knew where Bouthillette lived and from Lima's boast that Local 254 could rely on the aid of "terrorists" to achieve their objectives. On February 21, 1995, Bouthillette obtained from Rhode Island Superior Court a restraining order against Lima and any agents acting on his behalf.

By early March, Blue Cross officials had become concerned. John Leite ("Leite"), the Director of Facilities Management for Blue Cross and the official responsible for selecting janitorial contractors, called Bouthillette to ask about Intercity's confrontations with Local 254 at the Blue Cross facility. Leite ordered Bouthillette to settle the dispute. Plaintiff alleges that several weeks later Leite explained to Bouthillette that Intercity would be dismissed unless they agreed to the union's demands. According to plaintiff, Leite was primarily concerned with putting a halt to the disruptions within the Blue Cross facility.

Lima continued to call Bouthillette in March. Bouthillette maintains that Lima threatened to put Intercity out of business unless he complied with the wishes of Local 254. There is also evidence that officials of the union directly threatened Blue Cross. In an affidavit filed in support of plaintiff's cause, Gary St. Peter ("St.Peter"), a labor relations attorney for Blue Cross, describes a telephone conversation he had with Coleman on March 28, 1995. St. Peter claims that Coleman identified himself as an agent of Local 254. Coleman explained that the union was engaged in an organizing campaign of Intercity employees. St. Peter states that Coleman then threatened retaliation. The affidavit explains that Coleman said "[t]hat if Blue Cross/Blue Shield of Rhode Island did not pressure Intercity into recognizing Local 254 as the exclusive bargaining representative for Intercity's employees, [Local 254] would throw up a picket line at [Blue Cross's] premises." St. Peter contends that he warned Coleman that such action would constitute prohibited secondary activity and that Coleman responded that the union would do it anyway.

Local 254 launched a new tactic against Intercity in late March 1995. In a March 20, 1995 letter to Bouthillette, copied to Leite, Coleman declared that "a health emergency exists at Blue Cross Blue Shield and Women and Infants Hospital." Coleman alleged that Intercity was in violation of federal and state health laws by failing to provide employees with safety books or federally-approved safety training for handling hazardous substances. The letter specifically noted that Intercity regularly violated the "Blood Born Pathogen Act in that its cleaners on a daily basis are being exposed to urine, excrement and vomit that could contain contaminated

blood." Coleman asserted that the company had not provided employees with proper protective clothing and equipment. The letter concluded by asking a series of questions mainly related to a work site's ventilation system, though it is unclear from the letter to which site the questions relate.

That same day, Coleman wrote a letter to Leite explaining that Intercity had refused his request for information. Coleman, stated that "the union has a duty to protect its members along with the employyes [sic] of Bluecross [sic] from sickness and hazzards [sic] caused by chemical contamination." The letter demanded answers to the union's questions immediately.

Plaintiff alleges that the union's actions damaged its business relationship with Blue Cross. Intercity entered into a contract to provide janitorial services to Blue Cross in 1990. The one-year pact was renewed by Blue Cross the next year and each subsequent year until 1995. The parties often dispensed with contract formalities. They never executed new written agreements, but continued the relationship according to the terms of the 1990 writing. Each year Blue Cross sent Intercity a new purchase order for janitorial services for the upcoming year and Intercity continued its work without the necessity of bidding or negotiations. Plaintiff alleges that Blue Cross officials were thoroughly satisfied with the company's performance.

In the midst of Intercity's conflict with Local 254 in the early months of 1995, Bouthillette discussed with Leite a plan to provide Blue Cross with janitorial services during its planned construction project, expected to last for two years. By May, however, Leite's attitude had changed. Blue Cross decided to request competing bids on the janitorial services contract, something it had not done since first hiring Intercity in 1990. Bouthillette testified at his deposition about a conversation he had with Leite after learning that the Intercity contract would not be automatically renewed as had been done in the past, even though Intercity had not increased its proposed charges for the next year. Bouthillette claims that Leite explained that the contract was being bid because of Intercity's union troubles. Furthermore, Bouthillette alleges that Leite expressed an ultimatum: Intercity had a good chance at winning the contract if it agreed to Local 254's request, but it had no chance at all if Intercity continued to snub the union. Still, Bouthillette refused to negotiate with Local 254.

Blue Cross did not select Intercity for the cleaning contract. On June 29, 1995, Edward T. Sullivan, Jr., Local 254's Business Manager, wrote to John J. Sweeney, President of the International, touting Local 254's achievements in the region. Sullivan proudly reported "that Intercity has been expelled at Blue Cross/Blue Shield and replaced by a Local 254–contracted cleaner."

The union's strategy for organizing Intercity was not limited to pressuring Blue Cross. Plaintiff claims that in late March or early April 1995, Lima spoke to Intercity employees working at Women & Infants. Beginning at the end of March, Local 254 picketed Intercity at Woman & Infants for one week. Picketers distributed handbills to all who entered the hospital, including employees of Women & Infants, patients, and other visitors. The leaflets were clearly identified as the work of Local 254, and at least two of them were styled as letters to the public from Sullivan.

One handbill depicted a large bug encircled and crossed out by a diagonal line accompanied by the headline "Women and Infants TICKS us off." The leaflet read as follows:

INTERCITY MAINTENANCE COMPANY is an infestation that sucks the blood of Latino workers. Janitors at Women and Infants' Hospital are human beings and should not be treated as animals. INTERCITY has infected its cleaners as follows:

> INTERCITY does not pay a living wage
>
> INTERCITY does not pay Holiday pay
>
> INTERCITY does not pay health insurance
>
> INTERCITY exposes its cleaners to chemical and biological hazards including HIV and Hepatitis B virus
>
> WE DEMAND JUSTICE FOR JANITORS!
>
> STOP THE SPREAD OF THE INTERCITY PLAGUE!!

In another leaflet, Sullivan labeled Intercity "a notorious company." The handbill continued by claiming that the cleaning company pays

> its workers well below area standards, with literally no health insurance, paid holidays, vacation, pension, or job security rights. Intercity has turned back the clock, infesting your shop with the kind of sweatshop conditions you and your Unions fought so hard to exterminate.

The leaflet concluded by explaining that Local 254's

> intention here at Women and Infants is to stop the spread of the Intercity Plague and protect your workplace from sweatshop infection. We regret that the Hospital's insensitivity to the plight of Intercity workers forced us to involve you in this dispute, but, as you well know, sometimes dramatic measures are necessary to gain attention.

A final leaflet, dated April 7, 1995, was distributed after the hospital "notified Local 254 that Intercity Cleaning has no employees working here at Women and Infants!" At that point, the union ended its picketing and thanked the hospital's administration for "exterminating Intercity and its bloodsucking, plantation-minded boss, Michael Bouthilette [sic]."

Bouthillette claims that soon before the picketing at Women & Infants, several people called the Intercity office and left messages for him, referring to him as a "bug." One of the callers is identified by Bouthillette as Coleman. Bouthillette maintains that at about this same time, his secretary received a call from Lima who told her that the union was no longer interested in organizing the company and that they now aimed only to force Intercity out of business.

According to plaintiff, Local 254's actions against the cleaning company were not isolated incidents. Intercity urges this Court to view defendants' behavior in light of other campaigns to organize workers orchestrated by the union defendants. In 1993, Local 254 targeted workers of Aid Maintenance, a janitorial services firm operating in Rhode Island and southeastern Massachusetts. According to Coleman, the union picketed Aid Maintenance at the site of one of the company's cleaning clients. Coleman explained at his deposition that the picketing was designed to protest the wages paid by Aid Maintenance, which the union believed were below the area standard. Coleman also admitted that the union was intent on driving the company out of the region if it could not be organized. The undeveloped record is unclear, however, whether the picketing constituted improper secondary activity. Coleman denied that the union pressured the client to encourage Aid Maintenance to negotiate with Local 254. Eventually, the cleaning company lost its contract with this client.

Local 254's efforts to organize janitorial workers in Rhode Island and Massachusetts were encouraged and supported by the International. The International developed a nationwide organizing campaign called "Justice for Janitors" aimed at unionizing independent contractors that supply janitorial services. Coleman testified at his deposition that the International encouraged locals to create community-wide coalitions, including civic and religious groups, to spread the word about employers who paid wages and set work conditions deemed unfair by the coalition.

The purpose of this publicity was to pressure employers to adopt the union's standards for wages and benefits.

The International also subsidized Local 254's organizing activities in southeastern Massachusetts. In 1993, the International infused Local 254 with $10,000 each month for eight months for organizing projects. This financial support ended in February 1994. In exchange for its material assistance, the International required that the local provide it with summaries of its activities, accomplishments, and expenditures. One such three-page report dated October 22, 1993 sketches in broad strokes the local's campaign to organize janitorial services contractors in Massachusetts and Rhode Island. While the report lists picketing and leafleting as activities engaged in and lists the employment sites targeted, few details regarding the type, content, or intent of the activities are provided.

The International also played an important role in marking the jurisdictional boundaries of Local 254's activities. Although Local 254 is based in Boston and concentrates its efforts on workers in Massachusetts, its jurisdiction was expanded by the International during the course of its campaign to organize janitorial workers in the borderland region of northern Rhode Island and southeastern Massachusetts. During its 1993 campaign to organize Aid Maintenance, a Rhode Island-based company operating in Massachusetts, Local 254 received the nonexclusive right from the International to organize building services contractors in Rhode Island. This decision was issued by the president of the International, pursuant to the SEIU's Constitution and Bylaws, which governs the relationship between the International and local affiliates.[1] A jurisdictional dispute ensued between Local 254 and Local 134, an SEIU local based in Rhode Island. The International dispatched a hearing officer to resolve the conflict. The specifics of the dispute and its eventual resolution are complicated and largely irrelevant to this inquiry. What is relevant, however, is that in the end, the International successfully refereed the tussle and Local 254 was allowed some rights to operate within Rhode Island.

Plaintiff has presented no other evidence of involvement by officials of the International in the efforts of Local 254 to organize Intercity, Aid Maintenance, or any other janitorial services company in the southern New England area. Certainly, there is no evidence of direct participation by officials of the International in the acts denounced by plaintiff. There is also no evidence in the record revealing the extent of the International's knowledge of the methods used by Local 254 to organize Intercity or Aid Maintenance. This is not surprising given the substantial autonomy that locals are granted under the SEIU's Constitution and Bylaws. This document gives locals the power to elect officers, negotiate and execute collective bargaining agreements, rule on membership applications, maintain their own financial affairs, and establish independent rules and regulations. According to Joseph Buckley, Eastern Regional Director of the SEIU and the International employee best acquainted with the organization of SEIU locals in the northeast, Local 254 exercises all of these rights. He also declares in an affidavit that no employees of Local 254, including Coleman and Lima, are authorized agents of the International. Furthermore, Article XXI of the International's Constitution and Bylaws expressly limits the liability of the International for the acts of local unions.[2]

---

1. Article XIII of the SEIU Constitution and Bylaws provides that the International Executive Board is empowered to "determine all questions of jurisdiction between Local Unions."

2. The International's liability is limited by Article XXI of its Constitution and Bylaws:

 Except as is otherwise specifically provided in this Constitution, no Local Union, or affiliated body, nor any officer, employee, organizer or representative of a Local Union or affiliated body or of this Internation-

Plaintiff, concluding that the behavior of these labor organizations rises to the level of actionable violations of Intercity's legal rights, responded by commencing the instant lawsuit. The original pleading in this case was filed in 1995. That complaint alleged several causes of action grounded in federal labor law and state tort law. Senior Judge Raymond J. Pettine of this Court presided over this controversy until 1997, when the case was reassigned to this writer. In November 1997, this Court granted plaintiff's Motion to Amend by adding three additional state law counts. The Amended Complaint sets forth six causes of action, one based on federal labor law and five based on state law. Plaintiff seeks to hold each defendant liable on all counts.

Count I alleges that defendants tortiously interfered with the contractual relationship between plaintiff and Blue Cross. Count II alleges that defendants violated § 303(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, by engaging in prohibited secondary activity that harmed plaintiff. Count III alleges that defendants tortiously interfered with the advantageous business relationship between plaintiff and Blue Cross. Count IV alleges that defendants defamed plaintiff to Blue Cross. Count V alleges that defendants defamed plaintiff to Women & Infants. Count VI alleges that defendants violated the Rhode Island Privacy Act, R.I.Gen.Laws § 9–1–28.1, by placing plaintiff's business operations in a false light through defendants' actions at a Women & Infants facility. The Amended Complaint demands compensatory and punitive damages, as well as interest and costs. Subject matter jurisdiction is premised on the federal question doctrine and the supplemental jurisdiction provision of 28 U.S.C. § 1367. Before the Court now are the Motions for Summary Judgment on all counts filed by all defendants.

al Union shall be authorized to make contracts or incur liabilities for or in the name

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

On a motion for summary judgment, the Court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co.,* 133 F.3d at 106. "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I. 1991).

of the International Union unless authorized in writing [by the International].

## II. The Secondary Pressure Claim

### A. The Law of Improper Secondary Pressure

The law recognizes that labor disputes often create friction and unease among the warring parties. Given the realities of these struggles, much of the consequent strife is not actionable in a court of law. However, Congress has delimited the bounds of fair play in such conflicts. The universal marker of this limit is the "unfair labor practice." Although both antagonists in a labor dispute are restrained by the bit and bridle of the unfair labor practice rules, in this case the Court is concerned only with the prohibitions applicable to labor organizations. Through its landmark Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141 et seq., Congress has proscribed that labor organizations may not use certain organizing tactics deemed too costly to social and economic peace to achieve even appropriate ends. *See id.* § 158(b) (defining unfair labor practices by labor organizations).

Among the tactics prohibited by the federal labor laws is the application of an unlawful secondary boycott. The rule is found in § 8(b)(4)(ii)(B) of the LMRA:

> It shall be an unfair labor practice for a labor organization or its agents—
>
> . . .
>
> (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> . . .
>
> (B) forcing or requiring any person to cease . . . doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B). Underlying this prohibition is the Congressional intent to balance the resources of the partisans "by 'preserving the right of labor organiza-tions to bring pressure to bear on offending employers in primary labor disputes and [by] shielding unoffending employers and others from pressures in controversies not their own.'" *Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 259, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) (quoting *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)). The real bite of this provision is found at § 303 of the LMRA, which provides that "[w]hoever shall be injured in his business or property by reason of any violation" of the improper secondary pressure ban "may sue therefor in any district court of the United States." 29 U.S.C. § 187(b). Damages may be recovered if plaintiff is able to prove that they occurred "by reason of" the improper secondary activity. *See Morton,* 377 U.S. at 261, 84 S.Ct. 1253.

To understand the reach of this statutory rule, several important distinctions must be recognized. The first is between primary and secondary pressure, for a union runs afoul of the law only when it engages in the latter. Theoretically, the distinction is a simple one to draw. Pressure is primary when its target is the employer with whom the union has a labor dispute. Pressure is secondary when its target is some employer other than the one engaged in a labor dispute with the union applying the pressure. To make this distinction, courts inquire into the "object" of a union's activity. If "the object of the union's conduct, taken as a whole, is to bring indirect pressure on the primary employer by involving neutral or secondary employers in the dispute, the conduct is secondary and prohibited." *Abreen Corp. v. Laborers' Int'l Union,* 709 F.2d 748, 754–55 (1st Cir.1983). A plaintiff need not prove that the union's sole or primary object is to employ secondary pressure, only that one of its objects is the use of secondary pressure. *See Pye v. Teamsters Local Union No. 122,* 61 F.3d 1013, 1023 (1st Cir.1995); *see also Abreen Corp.,* 709 F.2d at 755 (holding that plain-

tiff must show that the secondary pressure is not "merely incidental[ ] to the pressure imposed on the primary employer"). Intent, therefore, is the first necessary element of a cause of action under § 8(b)(4)(ii)(B). *See Pye,* 61 F.3d at 1021; *Pepsi–Cola Co. v. Rhode Island Carpenters Dist. Council,* 962 F.Supp. 266, 273 (D.R.I.1997). Direct evidence of intent, a rare commodity, is not required, for intent may "logically be inferred from the nature of the conduct, evaluated in light of the practical realities of a given situation." *Pye,* 61 F.3d at 1022.

■ The distinction is muddied as the relationship between employers becomes more complex. Often a critical determination in resolving a secondary pressure claim involves the definition of secondary, or neutral, employers. No bright line rule governs this issue. A court must apply a totality of the circumstances test. *See National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). However, the United States Court of Appeals for the First Circuit has announced a useful test for making such determinations. The key inquiry is "whether there is actual or active common control sufficient to denote an appreciable integration of operations and management policies" between the two employers. *John B. Cruz Constr. Co. v. United Bhd. of Carpenters, Local 33,* 907 F.2d 1228, 1231 (1st Cir.1990).[3]

■ The second major distinction that must concern a court faced with a secondary boycott claim is the one between proper and improper secondary activity. It is well-settled that not all secondary pressure exerted by a labor organization is prohibited by law. "Unions may make peaceful appeals for support from the management of companies dealing with the primary employer." *Abreen Corp.,* 709 F.2d at 757. The federal reports are replete with explanations of the distinction between proper and improper secondary pressure. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 577–79, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (holding that prohibited secondary pressure involves coercion or threats); *NLRB v. Servette, Inc.,* 377 U.S. 46, 53–54, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964) (same); *Abreen Corp.,* 709 F.2d at 757 (same); *see also BE&K Constr. Co. v. United Bhd. of Carpenters,* 90 F.3d 1318, 1330 (8th Cir.1996) ("Even if the purpose of the activity is to force an employer to stop doing business with another, a union may attempt peacefully to persuade, induce, or encourage it to cease the relationship."). The defining characteristic of improper secondary pressure is coercion. " '[A] union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.' " *Morton,* 377 U.S. at 259, 84 S.Ct. 1253 (quoting *Local 1976, United Bhd. of Carpenters v. NLRB,* 357 U.S. 93, 99, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958)).

■ Coercion, therefore, is the second necessary element of a secondary boycott cause of action under § 8(b)(4)(ii)(B) of the LMRA. *See Pye,* 61 F.3d at 1022; *Pepsi–Cola Co.,* 962 F.Supp. at 273. Courts have

---

**3.** Another potential difficulty in making out a claim for improper secondary activity occurs when the primary employer's work site is also occupied by secondary employers. In these cases, union activity at the common situs may implicate the secondary activity prohibition unless the union can demonstrate that its conduct was purely primary. *See Cranshaw Constr. of New England, L.P. v. International Ass'n of Ironworkers, Local No. 7,* 891 F.Supp. 666, 672 (D.Mass.1995). Courts resort to the four-factor *Moore Dry Dock* test, deemed a useful "evidentiary tool" by the courts, to "aid in the line-drawing necessary in such cases." *Abreen Corp.,* 709 F.2d at 755; *see Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547 (1950). In the case sub judice, plaintiff's claims of improper secondary activity do not arise from union conduct at a common situs, although some union picketing in this case did occur at a Women & Infants facility where both plaintiff and neutral employers worked.

declined to impart a rigid and technical meaning to this term. Coercion, within this context, is a flexible concept, potentially encompassing many types of conduct. *See Pye,* 61 F.3d at 1024 (discussing a range of conduct that meets the statutory requirement). Mindful that the First Circuit advised that the secondary boycott provision is "pragmatic in its application," *Pye,* 61 F.3d at 1024, this Court will allow common sense to be the guide. Accordingly, there can be no dispute that picketing, or threatening to picket, a neutral employer to achieve a result in a labor dispute with some other employer satisfies the coercion test. *See Pepsi–Cola Co.,* 962 F.Supp. at 275.

## B. Statute of Limitations

■ Defendants pose as a bar to plaintiff's secondary boycott count the six-month statute of limitations applied to § 301 actions by the United States Supreme Court in *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). This attempt to forestall Intercity's federal cause of action is unavailing. The argument for applying the six-month limit has been rejected by the four circuit courts of appeals who have considered the question. *See BE & K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 763 (7th Cir.1998); *Prater v. United Mine Workers, Dists. 20 & 23,* 793 F.2d 1201, 1209–10 (11th Cir.1986); *Carruthers Ready–Mix, Inc. v. Cement Masons Local Union No. 520,* 779 F.2d 320, 327 (6th Cir.1985); *Monarch Long Beach Corp. v. Soft Drink Workers, Local 812,* 762 F.2d 228, 231 (2d Cir.1985). This Court finds the reasoning of those decisions persuasive. Therefore, the applicable statute of limitations for plaintiff's § 303 action is "the most closely analogous state limitations period." *BE & K Constr. Co.,* 156 F.3d at 763.

Plaintiff commenced this action on December 5, 1995, less than one year after the occurrence of the key events in this controversy. The most closely analogous state-law statute of limitations is that applied to actions for tortious interference with business relationships. A ten-year limitations period is applicable to such causes of action. *See* R.I.Gen.Laws § 9-1-13(a) (1997); *McBurney v. Roszkowski,* 687 A.2d 447, 449 (R.I.1997) (applying the ten-year limit to an action for tortious interference with a business relationship). Clearly, plaintiff's action falls well within the requirements of this rule. Therefore, this Court may address the substance of plaintiff's claim.

## C. Liability of the Individuals

■ Plaintiff seeks to hold liable both Coleman and Lima for damages it suffered from defendants' alleged improper secondary boycotting. This effort was doomed from the start. The law on this question could not be more clear. Civil liability for damages resulting from prohibited secondary pressure is premised upon 29 U.S.C. § 187. The grant of that right of action comes with an explicit proviso. The right to sue for damages is "subject to the limitations and provisions of section 185 of this title." *See* 29 U.S.C. § 187(b). Turning to § 185, even a less than diligent researcher discovers that "[a] money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." *See id.* § 185(b). Many courts have explained that on the basis of that quoted language, § 303 of the LMRA does not support individual liability. *See Prater,* 793 F.2d at 1207; *Charles D. Bonanno Linen Serv., Inc. v. McCarthy,* 708 F.2d 1, 8 (1st Cir.1983); *Cranshaw Constr. of New England, L.P.,* 891 F.Supp. at 673; *R.M. Perlman Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89–22–1,* 789 F.Supp. 127, 133 (S.D.N.Y.1992); *see also Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 414, 101 S.Ct. 1836, 68 L.Ed.2d

248 (1981) (explaining that in § 185 Congress intended to shield individuals from liability in LMRA § 301 and § 303 actions). Therefore, the Motions for Summary Judgment of Coleman and Lima are granted with respect to Count II of the Amended Complaint.

### D. Liability of Local 254

■ Plaintiff has placed more than enough material facts in dispute to defeat the motion of Local 254 on the question of liability for improper secondary activity. According to the St. Peter affidavit, Coleman threatened to boycott Blue Cross unless it ceased doing business with Intercity. There is no dispute that Coleman acted as Local 254's agent in this matter; he was in charge of the union's organizing efforts. There is also no dispute that Blue Cross was a secondary employer. Defendants have not argued that Blue Cross is an alter ego of Intercity or that Blue Cross effectively controlled the cleaning company.

Plaintiff has adduced sufficient evidence that Local 254 intended to involve Blue Cross in the Intercity labor dispute by employing prohibited organizing tactics. The St. Peter affidavit is itself sufficient to satisfy this element of the secondary boycott cause of action. When warned by St. Peter that his threat of picketing Blue Cross constituted prohibited secondary activity, Coleman brazenly responded that he didn't care. But there is more evidence from which this Court easily can infer an intent to exert unlawful pressure. During his deposition, Bouthillette explained that Lima, also an authorized agent of Local 254, told him during a recorded phone conversation that Local 254 would contact Blue Cross in order to sabotage Intercity's relationship if the cleaning company did not accede to the union's wishes. This testimony is bolstered by the transcriptions of those calls. Bouthillette's conversation with Lima provides insight into Local 254's reasons for calling St. Peter and corroborates St. Peter's statement. *See*

*Abreen Corp.,* 709 F.2d at 756 (holding that a union official's comments may be used to infer the object of union activity). The evidence presented by plaintiff is not subtle; it reveals a transparent intention by Local 254 to pressure Blue Cross improperly.

The threat to St. Peter also satisfies the coercion element of a secondary pressure cause of action. Coleman's promise to picket Blue Cross epitomizes the classic description of coercion within the labor law context. *See NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 687, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) (describing the classic forms of unlawful secondary activity). Plaintiff alleges that Blue Cross was cowed by these threats of labor disturbance and eventually choose to jettison Intercity rather than endure further troubles from Local 254. Bouthillette has testified that Leite admitted as much to him when he informed the Intercity president that the cleaning contract would not be automatically renewed. Whether there was a causal relationship between Intercity's loss of the Blue Cross contract and the threats of Local 254 is a matter reserved for the trier of fact. Therefore, Local 254's Motion for Summary Judgment with respect to Count II of the Amended Complaint is denied.

### E. Liability of the International

Plaintiff attempts to hoist liability up one more rung of the union hierarchy. The International, according to the Amended Complaint, must also answer for Intercity's damages resulting from Local 254's alleged improper secondary activity. Plaintiff argues that the International encouraged, ratified, and knowingly tolerated Local 254's prohibited behavior. However, the evidence adduced by plaintiff fails to support this argument.

■ Liability for a local union's actions does not attach to an international affiliate merely because of the hierarchical link between the two unions. *See Carbon Fuel Co. v. United Mine Workers,* 444

U.S. 212, 216–17, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). Rather, a plaintiff must satisfy the traditional rules of agency law to saddle an international union with responsibility for acts carried out directly by a local in violation of § 303 of the LMRA. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that § 303 liability is established according "to ordinary doctrines of agency"); *see also* 29 U.S.C. § 185(e). The United States Court of Appeals for the First Circuit explained that to hold an international union liable for the improper secondary activity of a local, a plaintiff must "show that the local acted as the international's agent or that the international independently participated in the unlawful conduct." *Borowiec v. Local No. 1570,* 889 F.2d 23, 26 (1st Cir.1989); *see Abreen Corp.,* 709 F.2d at 757; *see also Cranshaw Constr. of New England, L.P.,* 891 F.Supp. at 673 ("To be liable under § 303, a union must have instigated, supported, ratified, or encouraged the complained-of activity. . . .").

■■■ Plaintiff's evidence fails completely to establish a factual link between the specifically alleged acts of secondary activity and any officer or agent of the International. There is no evidence in the record that any officer of the International actively participated in the threats made to Blue Cross. The only direct evidence of conduct prohibited by § 303 adduced by plaintiff is contained in St. Peter's description of Coleman's telephone threat. However, St. Peter makes no mention of the International. Neither Coleman nor Lima, Local 254's point men for the Intercity campaign, even hint at participation by the International. Plainly, Intercity cannot identify a genuine dispute of material fact regarding actual participation by the International.

Plaintiff fares no better by relying on theories of agency law. No evidence in the record establishes an express agency relationship between the International and Local 254 in organizing matters. In fact, the International's Constitution and By-laws explicitly limits the International's liability to those acts expressly authorized by the International's governing body. Furthermore, according to Buckley, the International's regional official, the scheme of decentralized power within the SEIU grants Local 254 independent authority in matters involving organizing.

■■■ Apparent agency is another fruitless theory propounded by plaintiff. Turning to bedrock agency law, "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of Agency* § 8 (1958). To create such authority "the principle . . . must manifest to the third party . . . that he or she 'consents to have the act done on his [or her] behalf by the person purporting to act for him [or her].'" *Parrillo v. Chalk,* 681 A.2d 916, 919 (R.I.1996) (quoting *Restatement (Second) of Agency* § 27). A third party may properly rely on an apparent authority relationship if that party's belief in the principal's authorization of the agent was reasonable. *See Paul Revere Life Ins. Co. v. Fish,* 910 F.Supp. 58, 64 (D.R.I. 1996) (applying Rhode Island law). Plaintiff has failed to identify any act taken by the International and known to Intercity or Blue Cross that would lead a reasonable person to believe that Lima, Coleman, or Local 254 acted as the International's agent with respect to organizing matters. Statements made by Lima or Coleman to Bouthillette identifying themselves as agents of the International are insufficient to establish apparent authority. The agency relationship is created by the manifestations of the principal, not of the alleged agent. *See Parrillo,* 681 A.2d at 919.

Nevertheless, plaintiff argues that the International did act in several ways that created an agency relationship binding on the International. It is unclear from plaintiff's argument whether it advocates that

these actions established an express or an apparent authority relationship. That ambiguity is academic. None of the actions of the International spotlighted by plaintiff has any legal significance to the agency analysis.

First, plaintiff notes that the International subsidized Local 254's organizing campaign for janitorial workers to the tune of $10,000 per month for several months. Left unmentioned by plaintiff, however, is that the subsidy program ended six months before Local 254 began its efforts to unionize Intercity. Furthermore, there is no evidence that any official of Intercity or Blue Cross was aware of the subsidy before it was unearthed during the discovery process. Consequently, there could have been no reliance on the subsidy as a manifestation of an apparent agency relationship.

 The subsidy also is not evidence of an express agency relationship. Although the International requested the most basic of periodic reports on the use of the funds, the evidence in the record is clear that the International never controlled the tactics used by Local 254 or advised the local on organizing strategy. Plaintiff has failed to adduce any evidence that the International even knew of Local 254's tactics. An agency relationship may not be constructed on the basis of mere "normal union functions" such as reporting general activities to an affiliate. *Gibbs*, 383 U.S. at 738, 86 S.Ct. 1130; *see Federal Prescription Serv., Inc. v. Amalgamated Meat Cutters*, 527 F.2d 269, 276–77 (8th Cir.1975) (involving reporting between a local and an international union). Therefore, the subsidy is irrelevant to the question of agency in the Intercity organizing campaign.

 Likewise, the International's resolution of a jurisdictional dispute between Local 254 and Local 134 has no bearing on this question. Plaintiff endeavors to show that in granting Local 254 jurisdiction over Providence-area cleaners, the International assumed the position of principal for all of the local's actions. However, it is well established in the field of labor law that the exercise of supervisory powers by an international union in some matters of jurisdiction and governance is insufficient to establish a general agency relationship between the international and a local for all other matters. *See Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967, 974 (2d Cir.1987). The *Borowiec* Court rejected an argument similar to the one advanced here by plaintiff. In that case, the Court held that supervisory control by an international union over some aspects of a local union's governance does not subject the international to liability for the local's organizing activity where the local was afforded significant autonomy in many areas of its operations, including organizing. *See Borowiec*, 889 F.2d at 28. In the case sub judice, Local 254 enjoys autonomy in the conduct of its organizing activities according to the undisputed testimony of Buckley. Plaintiff's argument based on the jurisdictional settlement must fail.

Next, plaintiff clings to a meaningless scrap of evidence for support of a ratification theory. In June 1995, Sullivan sent a letter to the International's president informing him that Intercity had been "expelled" from Blue Cross. Plaintiff urges this Court to turn the law of ratification on its head by concluding that a letter from Local 254 to the International can have the effect of associating the International to prior acts of Local 254 described in summary fashion in the letter. Clearly, the letter can reasonably have no such effect. The Supreme Court has counseled that "it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that [the international union] involved itself in the dispute after the violence had occurred." *Gibbs*, 383 U.S. at 738, 86 S.Ct. 1130. Here, plaintiff's evidence fails even to demonstrate that the International "involved itself" after the fact. This Court will not resort to such an attenuated inference based on the paltry evidence of Sullivan's letter.

Finally, plaintiff hopes to pin liability on the International based on a theory of "knowing tolerance." According to this argument, the International should have known that Local 254 used improper secondary boycott tactics when it attempted to organize Aid Maintenance. Stretching an assumption into a precarious theory of liability, plaintiff maintains that having done nothing to dissuade the local from using prohibited tactics after the Aid Maintenance dispute, the International is responsible for Local 254's use of those same improper means of organizing Intercity. This reasoning suffers from several flaws.

First, no evidence in the record supports the contention that officials of the International were aware of acts of illegal secondary activity committed by agents of Local 254 in organizing Aid Maintenance. Plaintiff cannot rely on a theory of "knowing tolerance" when it has produced no evidence that officials of the International had knowledge of improper activities committed by Local 254 at any time. Second, no rule of law required the International to condemn improper acts committed by a local union with which it had no agency relationship for organizing matters. *See Gibbs*, 383 U.S. at 739, 86 S.Ct. 1130 ("There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred."). For either of these reasons, plaintiff's final argument for International liability fails. Therefore, the Motion for Summary Judgment by the International on Count II of the Amended Complaint is granted.

**III. Supplemental Jurisdiction**

■■■■■ With the secondary boycott claim against the International and the two individual defendants resolved, no federal cause of action remains against these three defendants. Because plaintiff has not alleged diversity of the parties, this Court can only base subject matter jurisdiction over plaintiff's state law claims against these three parties under the supplemental jurisdiction provision of 28 U.S.C. § 1367. That statute provides that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Supplemental jurisdiction extends to pendent parties as well as pendent claims. *See id.* ("Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."). This Court has power to hear both state and federal claims if they all would ordinarily be expected to be tried in one judicial proceeding. *See Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 563–64 (1st Cir. 1997); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 190 (1st Cir.1996). In particular, "[t]he state and federal claims must derive from a common nucleus of operative fact." *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130; *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1175 (1st Cir.1995).

■■■■■ However, the exercise of supplemental jurisdiction is discretionary. *See Penobscot*, 112 F.3d at 564; *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256–57 (1st Cir.1996). In determining whether to exercise this discretion, the district court should " 'take into account concerns of comity, judicial economy, convenience, fairness, and the like.' " *Penobscot*, 112 F.3d at 564 (quoting *Roche*, 81 F.3d at 257). The supplemental jurisdiction statute itself provides four grounds for declining the exercise of this jurisdiction:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

■■■ This Court can identify no compelling reason to decline supplemental jurisdiction over the state law claims advanced by plaintiff. The causes of action involved, tortious interference, defamation, and false light, are of the rather ordinary variety. This Court has considerable experience applying the well-worn rules of Rhode Island law in these areas. Despite the presence of these several state law claims, the federal claim of improper secondary pressure still predominates in this dispute. The state torts are ancillary to the central controversy regarding the quality and kind of defendants' unionization struggle with Intercity. Furthermore, given this Court's significant investment of time in deciding a number of preliminary issues in this long-running litigation, the interests of judicial economy militate in favor of the exercise of supplemental jurisdiction. Therefore, this Court will now address the viability of these state law actions.

## IV. The Tortious Interference Claims

Two of plaintiff's state law claims invoke the law of tortious interference with business relationships. In the first of these, plaintiff contends that defendants tortiously interfered with Intercity's contract to provide janitorial services to Blue Cross. The second claim is a gloss on the first. Plaintiff argues that defendants tortiously interfered with Intercity's advantageous business relationship with Blue Cross. The strongest argument raised by defendants in rebuttal calls into doubt the sufficiency of plaintiff's evidence of causation. However, this Court need not test the merits of this pair of claims because both are preempted by federal labor law.

■■■ State law may not encroach upon the system of federal laws governing labor relations; local laws that attempt to occupy the same or similar ground as the national scheme are preempted. *See Morton,* 377 U.S. at 259–60, 84 S.Ct. 1253. Federal predominance in this area is necessary to ensure that "the balance of power between labor and management expressed in our national policy" is not upset. *Id.* at 260, 84 S.Ct. 1253. Preemption is necessary "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Claims of tortious interference with contractual relations,[4] when based on conduct that is regulated by the LMRA, are subject to the preemption doctrine. *See BE&K Constr. Co.,* 90 F.3d at 1330 (preempting state law tortious interference claim); *Ehredt Underground, Inc. v. Commonwealth Edison Co.,* 90 F.3d 238, 240–41 (7th Cir.1996) (same); *Allied Int'l, Inc. v. International Longshoremen's Ass'n,* 640 F.2d 1368, 1381 (1st Cir.1981) (preempting federal common law claim of tortious interference).

■■■ Plaintiff readily acknowledges the authority of this general rule. Howev-

---

4. The two types of tortious interference alleged by plaintiff are equivalent causes of action for the purposes of preemption analysis. Although Rhode Island law recognizes as independent actions claims of tortious interference with contract and tortious interference with advantageous business relations, only one element, irrelevant for preemption purposes, separates the two. *See Mesolella v. City of Providence,* 508 A.2d 661, 669–70 (R.I.

1986) (explaining that a plaintiff need not prove the existence of a contract when the claim is based on interference with a prospective business relationship); *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 51 F.Supp.2d 81, 101 (D.R.I.1999) (explaining that "the legal requirements for establishing these two torts are identical" except for the difference identified in *Mesolella* ).

er, Intercity urges that its claim fits within a well-established exception to the federal preemption doctrine carved out by the United States Supreme Court in its *San Diego Building Trades Council* decision. According to the Court, states may "grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order." *San Diego Bldg. Trades Council,* 359 U.S. at 247, 79 S.Ct. 773; *see Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 136, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Violence alters the federalism balance and trumps the interests of preemption because of the "compelling state interest in the maintenance of domestic peace." *Gibbs,* 383 U.S. at 721, 86 S.Ct. 1130. Furthermore, state regulation of such activity, outside of the bounds of conduct protected by the federal labor laws, does not compromise the national scheme of labor relations policy. *See San Diego Bldg. Trades Council,* 359 U.S. at 247, 79 S.Ct. 773. Violent picketing is "[t]he paradigmatic example" of conduct that may be actionable under state law. *Palm Beach Co. v. Journeymen's & Prod. Allied Servs.,* 519 F.Supp. 705, 713 (S.D.N.Y.1981). However, courts have allowed state law causes of action alleging other types of violent activity to proceed as well, including claims based on sabotage and vandalism. *See Printpack, Inc. v. Graphic Communications Union, Local 761–S,* 988 F.Supp. 1201, 1204 (S.D.Ind.1997) (involving sabotage); *Cranshaw Constr. of New England, L.P.,* 891 F.Supp. at 675 (involving vandalism).

This limited exception is inapplicable to plaintiff's claim because the only threats of violence found within the record were directed at Bouthillette and were entirely unrelated to Blue Cross. Plaintiff does not allege that defendants committed any acts of actual violence. Instead, plaintiff directs the Court's attention to comments made by Lima, and by others alleged to be Lima's associates, to Bouthillette and to Bouthillette's secretary. For instance, one

of plaintiff's phone call transcriptions records Lima warning that he knows where Bouthillette lives. Bouthillette also testified at his deposition that Lima boasted about his access to "Latino terrorist organizations" employed to enforce the union's will. Based on these and similar allegations, Bouthillette received a restraining order against Lima and others working on Lima's behalf.

The problem with plaintiff's argument is apparent. None of the threats attributed to defendants are in any way related to Intercity's relationship with Blue Cross. There is no evidence that any official of Blue Cross was ever threatened with violence. Furthermore, there is no evidence that Blue Cross officials were even aware of the threats allegedly directed at Bouthillette. Plaintiff may not escape the impact of the important federal policy of preemption by alleging threats of violence that are totally irrelevant to its state cause of action.

The *Gibbs* Court emphasized the limited nature of the violence exception. In that case the Court agreed with the petitioner that "the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity." *Gibbs,* 383 U.S. at 729, 86 S.Ct. 1130. Restating its holding from a previous decision, the Court continued by stressing the centrality of causation to this preemption exception. A state law cause of action may proceed only when there exists "a proximate relation between the violence and threats of force and violence complained of, on the one hand, and the [damages] allegedly suffered, on the other." *Id.* at 730, 86 S.Ct. 1130.

Although causation is typically a matter within the jury's realm, this Court recently recognized that "a court may properly intervene" if plaintiff fails entirely to adduce evidence supporting this vital element. *See Ed Peters Jewelry Co. v. C & J Jewel-*

*ry Co.,* 51 F.Supp.2d 81, 101 (D.R.I.1999) (citing *Russo v. Baxter Healthcare Corp.,* 140 F.3d 6, 12 (1st Cir.1998)). No evidence within the record would permit any finder of fact to conclude that the threats alleged by plaintiff caused Blue Cross to end its business relationship with Intercity. The only evidence of violence adduced by plaintiff is irrelevant to these two tort counts. Consequently, the two state causes of action for tortious interference do not fit within the narrow confines of the violence exception to the general preemption rule. Therefore, the preemption doctrine applies to both counts. Defendants' motions as to Counts I and III are granted.

### V. The Defamation Claims

### A. Defamation Law in the Labor Context

Counts IV and V of the Amended Complaint allege that defendants defamed Intercity through various communications with Blue Cross and Women & Infants. Plaintiff contends that statements made by defendants to Blue Cross "implied that Intercity conducted its business in an unlawful and unsanitary manner endangering Blue Cross and its patrons and employees." Amended Complaint ¶ 58. Similarly, the pleading argues that statements made to patrons and employees of Women & Infants also implied that Intercity "conducted its business in an unlawful and unsanitary manner, spreading infectious diseases endangering Women and Infants and its patrons and employees." Amended Complaint ¶ 64. The offending statements, discussed in detail above, were contained in two letters penned by Coleman and sent to a Blue Cross official and three handbills created by Local 254 and distributed to the public near a Women & Infants facility.

To avoid defamation liability, defendants first seek the shelter of the preemption doctrine. This effort is futile. In *Linn v. United Plant Guard Workers,* 383

U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the United States Supreme Court held that a state law defamation action is not preempted by the LMRA "provided it is limited to redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false." *Id.* at 61, 86 S.Ct. 657. Federal preemption in such cases is inappropriate because of the "overriding state interest in protecting ... residents from malicious libels." *Id.* The key to this particular species of preemption analysis is malice. Causes of action based on state law are preempted to the extent to which they seek to make actionable defamatory statements that were made without malice. *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 272–73, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

The malice rule imposed by *Linn* reflects the Supreme Court's desire to preserve the special status of free speech rights under federal labor law. *See Old Dominion,* 418 U.S. at 272, 94 S.Ct. 2770. Concern for "unwarranted intrusion upon free discussion envisioned by the" labor laws led the Court to fashion limits on the reach of state defamation actions. *Linn,* 383 U.S. at 65, 86 S.Ct. 657. The *Linn* Court explained that "[l]abor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable per se in some state jurisdictions." *Id.* at 58, 86 S.Ct. 657. In contrast to such state laws, federal labor law "tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees." *Id.* at 61, 86 S.Ct. 657. But the line is drawn at malicious defamation. Therefore, to serve both the objectives of federal labor law and state anti-defamation law, the Court imported into the labor context the standards for defamation actions involving public figures enunciated by the Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The *Sullivan* standard requires that a plaintiff prove that a publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan,* 376 U.S. at 280, 84 S.Ct. 710; *see Old Dominion,* 418 U.S. at 281, 94 S.Ct. 2770 (applying the *Sullivan* test to a labor dispute). This is the definition of malice applicable in the case sub judice. Whether defendants harbor any ill will or spite toward plaintiff is irrelevant to this analysis. *See Old Dominion,* 418 U.S. at 281, 94 S.Ct. 2770.

Given the special role of the federal government in promoting national labor policy, the Supreme Court has attempted to provide the lower courts with some guidance in determining whether certain specific statements are protected from state condemnation when made in the heat of a labor dispute. Much of the hyperbolic language typical of bitter struggles between zealous organizers and defiant managers is protected by federal law. Language that might ordinarily offend the civility of polite company is tolerated and absolutely protected by law within the labor context. "[F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Old Dominion,* 418 U.S. at 283, 94 S.Ct. 2770. Even the "most repulsive speech enjoys immunity" if its speaker passes the malice test. *Linn,* 383 U.S. at 63, 86 S.Ct. 657. For example, the Court has protected union defendants from liability for using terms such as "scab," even when the word was defined in the publication as a *person with "rotten principles"* who lacks "character" and for whom "Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out." *See Old Dominion,* 418 U.S. at 268, 283–84, 94 S.Ct. 2770 (quoting union literature attributed to the author Jack London).

The shield of federal immunity extends even beyond instances of abusive language and name calling to "loose language" and exaggerated use of slogans. *Id.* at 284, 94 S.Ct. 2770. For example, labeling a union opponent a "traitor" or "fascist" is generally a protected act. *See id.* Even though a defendant cannot prove that its target fits the legal or common definitions of these words, the statements are not actionable because they are properly understood as expressions of opinion and not of fact. *See id.* "[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." *Cafeteria Employees Union Local 302 v. Angelos,* 320 U.S. 293, 295, 64 S.Ct. 126, 88 L.Ed. 58 (1943).

 Many of the statements made by defendants that form the basis of plaintiff's grievance fall well within the immunized category of "rhetorical hyperbole." They are simply "lusty and imaginative expression[s] of the contempt felt by union members" towards a stubborn owner. *Old Dominion,* 418 U.S. at 286, 94 S.Ct. 2770. So protected are the references in the handbills distributed at the Women & Infants facility to "bloodsucking, plantation-minded boss," "notorious company," "the Intercity plague," the Intercity "infestation," and Intercity's "sweatshop conditions." Also protected as a matter of opinion is the statement in the March 20, 1995 letter to Bouthillette and Leite that "a health emergency exists" at both Blue Cross and Women & Infants based on Intercity's lax procedures in handling hazardous materials. This statement might refer to any number of conditions at the work site and is not a matter that can be proved or disproved by resort to objective data.

 More problematic for defendants are specific statements made in the first letter sent on March 20, 1995 and in two of the handbills distributed at Women & Infants. These remaining statements can be divided into two categories: one set relates to wages and benefits provided Intercity employees and the other relates to the health and safety conditions under which Intercity employees work.

With regard to the statements in the first group, there are some triable issues of fact that this Court is unable to resolve at this stage of the litigation. Although the statement that Intercity does not pay a "living wage" is a protected matter of opinion, the statement that the company pays its employees "well below area standards" is an assertion of fact that can be verified by objective data. Bouthillette contends that Intercity paid its employees above area standards. Coleman testified at his deposition that the statement was based on his assumption that Intercity employees working at women & Infants were paid comparably to those working at Blue Cross. However, he admits that little, if any, investigation was conducted prior to publishing the statements. The relevant portions of Coleman's deposition testimony follow:

Q.: At the time that you prepared and distributed this handbill, you did not have that information as to what Intercity was paying its janitorial workers assigned to Women and Infants?

A.: That's correct. I hadn't talked to the people there.

Q.: And so, you published and prepared this document in disregard as to what the actual facts were with respect to Intercity's employees—

A.: Well, I published—

. . . .

Q.:—assigned to Women and Infants?

. . . .

A.: Well, I published it in regards to whatever information was available to me that I could put in it.

Q.: But you didn't have any information about what the compensation and benefits were of Women and Infants employees—of strike—at the time you prepared Plaintiff's 12, you just told us that you didn't have any information about the terms and conditions of employment of Inter-

city's workers assigned to Women and Infants?

A.: Well, I made an assumption that they were probably paid similarly as they were paid at Blue Cross.

Q.: And that assumption was not based on facts?

. . . .

A.: It was an assumption. That's correct.

A genuine dispute as to the truth of these statements regarding wages exists. The evidence regarding holiday pay, vacation time, health insurance, and job security rights is similarly disputed. These conflicts in the record over material facts cannot be resolved on the motions before the Court. Furthermore, even if proved to be false, the question of malice is too close a call for this Court to make now given Coleman's shaky testimony about his efforts to investigate the facts.

In the second group of actionable statements are allegations concerning the adequacy of Intercity's safety program. By declaring Intercity in violation of federal and state laws, Local 254 left behind the realm of opinion and assumed the position of a reporter of fact. Statements intended to be factual representations of Intercity's health and safety record were contained in both the letters to Leite and in one of the handbills. The first letter from Coleman, copied to Leite, made the following factual assertions regarding Intercity's employment practices at the Blue Cross site: 1) Intercity was in violation of both federal and state laws by failing to provide safety manuals and approved training to its employees, 2) Intercity was in violation of the Blood Born Pathogen Act by exposing its workers to hazardous human waste, 3) Intercity failed to provide its employees with appropriate safety equipment and clothing. One of the handbills also contains the factual representation that Intercity exposes its workers at the Women & Infants site to "chemical and biological hazards including HIV and Hepatitis B

virus." In an affidavit, Bouthillette denies that Intercity was ever in violation of federal or state law and asserts that the company provided its employees with appropriate training and equipment. Therefore, there is a triable issue of material fact with respect to the falsity of these statements.

There is also some evidence that these statements were made with malice. According to his deposition testimony, before writing the letters to Leite, Coleman never actually investigated the working conditions of Intercity employees at the Women & Infants site. To the contrary, he substituted assumption for actual observation. Coleman assumed that conditions at Women & Infants were equivalent to those at Blue Cross. Compounding the problem, Coleman's testimony raises a serious question regarding the extent of his investigation into working conditions at Blue Cross, the very conditions that underlie his assumptions about the Women & Infants site. The relevant portion of his deposition follows:

Q.: In Plaintiff's Exhibit 12, you state Intercity exposes its cleaners to chemical and biological hazards, including HIV and Hepatitis B virus?

A.: Yes, I did.

Q.: Upon what information did you base that statement?

A.: Based on the fact that he doesn't provide rubber gloves to his cleaners.

Q.: How do you know that at the time you wrote this?

A.: From my observations as to his practices at Blue Cross.

Q.: But at the time you didn't locate or secure any of Intercity's workers at Women and Infants?

A.: That's correct. Yes, it was an assumption.

Q.: And the assumption that you made was not based upon facts?

. . . .

A.: It is, yeah, you could say that.

Q.: And it was not made based upon an investigation?

A.: Well—

. . . .

Q.:—of Intercity workers at Blue Cross?

A.: As best I could investigate.

Q.: And the investigation was never concluded?

A.: No. I didn't actually—wasn't able to locate the people.

Q.: And despite that, you made all of the statements set forth—

A.: Yes.

Q.:—in Exhibit 12?

. . . .

A. Yes.

Based on this evidence, plaintiff has demonstrated that a genuine dispute of material fact exists regarding Coleman's malicious intent in making these statements.

**B. Liability for the Defamation Claims**

Liability for these alleged defamations does not extend to all of the defendants named in plaintiff's lawsuit. Clearly, Coleman is responsible for the statements in his letter of March 20, 1995 alleging safety violations by Intercity. Local 254 is liable as a principal for the statements made by Sullivan and Coleman regarding Intercity wages and benefits as well as safety violations. However, there is no evidence in the record linking any of the actionable statements to Lima. Therefore, of these three defendants, only Lima is entitled to summary judgment on Counts IV and V.

▮▮▮ The liability of the International deserves a special, if brief, discussion. The standard of proof for imposing liability on an international union for the acts of a local affiliate that may violate state law is more demanding than the traditional rule of civil liability. Under § 6 of the Norris–LaGuardia Act:

No officer or member of any association or organization ... participating or in-

terested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106. Although the normal rules of agency law apply to determine the liability of a union for acts of secondary boycotting by affiliate unions, the special standard of § 6 applies to state law actions such as the defamation claims before the Court. *See Gibbs*, 383 U.S. at 736, 86 S.Ct. 1130 (explaining the application of the different standards of liability for § 303 actions and state law actions). The "clear proof" rule is a "higher" standard for imposing liability than that provided by traditional agency law. *Johnson v. Teamsters Local 559*, 102 F.3d 21, 27 (1st Cir. 1996). The *Gibbs* Court explained that in order to satisfy this heightened standard, a plaintiff "is required to persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.'" *Gibbs*, 383 U.S. at 737, 86 S.Ct. 1130 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)).

Given this exacting standard and this Court's previous discussion of the lack of evidence associating the International to any of the acts of Local 254, plaintiff cannot maintain causes of action for defamation against the International. To link the International to the statements at issue, plaintiff relies on the same evidence that this Court deemed inadequate to hold the International liable under § 303. Plaintiff identifies no additional evidence supporting liability of the International. Therefore, even under traditional agency principles, plaintiff cannot establish the liability of the International, to say nothing of the problems facing plaintiff under the clear proof standard. The International's Motion for Summary Judgment as to Counts IV and V is granted.

## VI. The False Light Claim

Plaintiff further seeks to hold defendants liable under the Rhode Island Privacy Act, R.I.Gen.Laws § 9–1–28.1, for publicly portraying Intercity in a false light. The Rhode Island statute allows a false light action when "[t]here has been some publication of a false or fictitious fact which implies an association which does not exist" and when "[t]he association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances." R.I.Gen.Laws § 9–1–28.1(a)(4)(i).

The Rhode Island legislature borrowed the Privacy Act's scheme of four privacy torts, including the tort of false light, from the doctrine of privacy torts promulgated by the *Restatement (Second) of Torts*. *See Liu v. Striuli*, 36 F.Supp.2d 452, 479 (D.R.I.1999); *Restatement (Second) of Torts* §§ 652B–E (establishing the four privacy torts). Accordingly, Rhode Island courts have often turned to the *Restatement* as an authority on the matter of privacy torts. *See Swerdlick v. Koch*, 721 A.2d 849, 861–62 (R.I.1998); *Pontbriand v. Sundlun*, 699 A.2d 856, 863 (R.I.1997). The *Restatement* defines the scope of the right to privacy: "Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." *Restatement (Second) of Torts* § 652I. Under this rule of tort law, a corporation does not enjoy privacy rights. *See id.* cmt. c. "It has therefore no cause of action for any of the four forms of invasion covered by §§ 652B to 652E." *Id.; see id.* § 652E (false light tort). Given the respect with which the Rhode Island state courts accord the *Restatement* on matters of privacy law otherwise unresolved by state law, this Court has no qualms in concluding that the Rhode Island courts would adopt the *Restatement*'s rule on corporate privacy. Therefore, Count VI of the Amended Complaint fails as a matter of law.

## VII. Punitive Damages

█ Finally, this Court will address defendants' argument that plaintiff may not recover punitive damages in this lawsuit. The only causes of action remaining are those for improper secondary activity under 29 U.S.C. § 187 and for defamation under Rhode Island common law. Plaintiff may not recover punitive damages on its claim of unlawful secondary activity. *See International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Morton*, 377 U.S. at 260–61, 84 S.Ct. 1253; *Amoco Oil Co. v. Local 99, Int'l Bhd. of Elec. Workers*, 536 F.Supp. 1203, 1224 (D.R.I.1982). As the LMRA makes clear, plaintiff's recovery for unlawful secondary pressure is limited to compensatory damages. *See* 29 U.S.C. § 187(b) ("Whoever shall be injured in his business or property . . . shall recover the damages by him sustained. . . ."); *Morton*, 377 U.S. at 260, 84 S.Ct. 1253 (holding that recovery is limited "to actual, compensatory damages"). Accordingly, defendants' Motions for Summary Judgement with respect to the punitive damages claims contained in Count II of the Amended Complaint are granted.

█ However, punitive damages are available for the defamation claims. As this Court discussed above, federal labor law does not preempt this state law cause of action. Under Rhode Island law, punitive damages may be recovered in defamation suits. *See Johnson v. Johnson*, 654 A.2d 1212, 1217 (R.I.1995). Such exemplary damages must be based on a finding of malice or bad faith. *See Palmisano v. Toth*, 624 A.2d 314, 318 (R.I.1993). This Court had occasion recently to address the standard for an award of punitive damages under Rhode Island law in *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 400 (D.R.I.1998). In that decision, this Court explained that "[t]he Rhode Island Supreme Court has discussed with approval this Court's formulation of the test: the plaintiff must allege that the defendant intended to cause harm." *Id.*

Given the evidence currently in the record, this Court can only conclude that a dispute of material fact exists regarding the "willfullness, recklessness or wickedness" of the defendants in making the offending statements. *Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195, 196 (1974). There is some evidence that Local 254, Lima, and Coleman wished to drive Intercity out of business. If the offending statements were made to damage plaintiff for the sake of causing it harm, then plaintiff may recover exemplary damages. Such a determination, necessarily entangled in questions of credibility and motivation, is not an appropriate matter for summary judgment disposition given the varying accounts of the circumstances surrounding this dispute. Defendants' Motions for Summary Judgment with respect to the requests for punitive damages within Counts IV and V of the Amended Complaint are denied.

### CONCLUSION

For the foregoing reasons, defendants' Motions for Summary Judgment are granted in part and denied in part. The Motions of all defendants are granted with respect to Counts I, III, and VI of the Amended Complaint. On Count II of the Amended Complaint, the Motions of the International, Lima, and Coleman are granted and the Motion of Local 254 is denied. On Counts IV and V of the Amended Complaint, the Motions of the International and Lima are granted and the Motions of Local 254 and Coleman are denied. Finally, plaintiff's claim for punitive damages contained in Count II of the Amended Complaint is dismissed. No judgments shall enter until all claims are resolved.

It is so ordered.